IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF OKLAHOMA

FLOYD PATTERSON, JR., as          )
Special Administrator of the      )
Estate of FLOYD PATTERSON         )
III, deceased                     )
                                  )
          Plaintiff               )
                                  )
-vs-                              ) No. 20-CV-040-RAW
                                  )
ANDY SIMMONS, in his              )
official capacity, et al.         )
                                  )
          Defendants              )

DEPOSITION OF JOHN ROBERT FRAZIER

TAKEN ON BEHALF OF THE PLAINTIFF

IN MUSKOGEE, OKLAHOMA

ON NOVEMBER 12, 2021

REPORTED BY:  SUSAN G. STOTTS, C.S.R.

EXHIBIT 17

1    Q.    And do you recall who made that decision to

2  hire you there?

3    A.    The town council.

4    Q.    And do you know who was on the town council

5  at the time?

6    A.    Bob Boatman, Jerry Harris, Tim Murphy,

7  Michael Sharpe, and Tim Smith.

8    Q.    And prior to going to work at the Fort

9  Gibson Police Department, where were you employed?

10    A.    The Muskogee County Sheriff's Office.

11    Q.    In what capacity?

12    A.    As the sheriff.

13    Q.    And in what period of time did you serve as

14  the sheriff of Muskogee County?

15    A.    From January of 2017 until, I believe,

16  February of 2020.

17    Q.    Who did you replace when you began serving

18  in January of '17?

19    A.    Sheriff Charles Pearson.

20    Q.    Had you worked at the Muskogee County

21  Sheriff's Office prior to becoming the sheriff?

22    A.    Approximately a month before I actually was

23  sworn in.  I came in about a month early.

24    Q.    Okay.  But prior to winning the election,

25  had you ever worked there?

EXHIBIT 17

1  opinion and it being an untrue statement.

2      Q.   So let's focus on what you thought were

3  untrue statements.

4      A.   I don't believe we were understaffed at that

5  time.  I believe that was stated in one or two of the

6  depositions.  I think that's the main thing.

7      Q.   And that was routinely discussed with you?

8  Do you recall reading that that was routinely

9  discussed with you, the staffing?

10     A.   Yes.  That was never discussed with me.

11     Q.   Do you dispute that testimony?

12     A.   Yes.

13     Q.   Why do you think those individuals are lying

14  about that?

15     A.   I don't know.

16     Q.   Can you think of any possible motivation

17  that those employees would have to lie about that?

18     A.   No.

19          MR. ARTUS:  Let's take a break.

20          (A short break was had.)

21          MR. SMOLEN:  I'm going to show him

22  Plaintiff's Exhibit No. 14.  It's the Muskogee County

23  Detention Center policies and procedures.  It's DDR254.

24          MS. DARK:  Got it.  Thanks.

25     Q.   (By Mr. Smolen) Do you recognize this policy

EXHIBIT 17

27

1    and procedure from the Muskogee County Detention Health

2    Care Administration?

3         A.   Yes.

4         Q.   And this was the policy and procedure that

5    was in place at the time Mr. Patterson died, correct?

6         A.   Yes.

7         Q.   First sentence under Procedures -- second

8    sentence, "The jail's health care plan has been

9    developed with the assistance of the jail's physician

10   and complies with State standards."

11              Was there a jail physician at the time that

12   you were the sheriff of Muskogee County?

13        A.   Yes.  I believe Nurse Practitioner Michael

14   Smith.

15        Q.   Okay.  He was not a physician, correct?

16        A.   He was a nurse practitioner.

17        Q.   So there was not a physician at the jail,

18   correct?

19        A.   There was a nurse practitioner.

20        Q.   Which is not a physician, correct?

21        A.   That's correct.

22        Q.   And tell me, since you didn't have a

23   physician and you were using a nurse practitioner,

24   what did the nurse practitioner do to develop the jail

25   health care administration plan?

EXHIBIT 17

1   correct?

2       A.   Yes.   That's what the policy says, yes.

3       Q.   If you didn't follow the policy, do you know

4   how the budget was determined?

5       A.   Yes.

6       Q.   How?

7       A.   I, ultimately, made the budget.

8       Q.   And what did you make the budget based on?

9       A.   The budgets previously, also what was spent,

10  money coming in, money coming out.

11      Q.   Who did you deem to be the medical

12  supervisor after Turn Key left the Muskogee County

13  jail?

14      A.   Ellen Arnold.

15      Q.   And did she remain the medical -- what you

16  believe to be the medical supervisor until the time

17  you left the sheriff's office?

18      A.   Yes.

19      Q.   We're -- it says, "The medical supervisor

20  will ensure that outside medical resources and

21  specialized medical treatment is available to the

22  jail's health care program with a full range of health

23  care options for all inmates."  Do you see that?

24      A.   Yes.

25      Q.   And was Ellen Arnold in charge of that?

EXHIBIT 17

1     Q.   I'm going to look at Page 102.  It's DDR2102

2  under Medical Screening.  Are you with me?

3     A.   Yeah.

4     Q.   It says, "The medical staff will screen all

5  inmates if available.  If not, the intake officer will

6  interview the individual committing the prisoner and

7  the prisoner to obtain as many items of information

8  required by the medical intake screening form as

9  possible," correct?

10     A.   Yes.

11     Q.   It goes on to say that, "They will also

12  determine if the prisoner is in need of medical

13  treatment," correct?

14     A.   Yes.

15     Q.   You did not have medical staff that were

16  present during the weekends; is that correct?

17     A.   No.  That's not correct.

18     Q.   Okay.  Who was your medical staff that was

19  available during the weekends?

20     A.   At this particular time or --

21     Q.   Yes, sir.

22     A.   I believe Ms. Petroski.  I don't know if I'm

23  saying her name right.  We also had Ellen Arnold that

24  was on call.  We had Mike Smith that was on call.  We

25  had the emergency room that was on call.

EXHIBIT 17

1      Q.    Those were individuals that were on call,

2   but they certainly weren't there doing medical

3   screenings, were they?

4      A.    That's correct.

5      Q.    And you identified Ms. Petroski; is that

6   right?

7      A.    I believe that's her name.

8      Q.    And did you have an understanding that she

9   was conducting inmate medical screenings?

10      A.    It's my understanding that the intake

11   officer was doing the screening.

12      Q.    For Mr. Patterson?

13      A.    Yes.

14      Q.    Okay.  And I'm just talking about in

15   general.  Was Ms. Petroski, to your knowledge, doing

16   intake health screening on inmates?

17      A.    I don't know.

18      Q.    Was your jail staff specifically trained on

19   medical?

20      A.    Medical in general?

21      Q.    Yeah.

22      A.    Yes.

23      Q.    Okay.  And how were they trained on medical?

24      A.    Through their jail school.

25      Q.    And what did their jail school train them as

EXHIBIT 17

47

1   it pertained to medical?

2       A.    I'm not for sure all of the class

3   prerequisites.

4       Q.    How about any of them?

5       A.    I know that they were -- had a class on

6   diabetes.  I'm pretty sure they had a class on CPR.

7   That's all that I can think of right off the top of my

8   head.

9       Q.    Okay.  I want to look at DDR No. 2, Page 143

10  under your Health Services Policies and Procedures.

11  Are you there?

12              MR. ARTUS:  DDR what?

13              MR. KELLER:  DDR2, Page 153.

14      Q.    (By Mr. Smolen) Are you with me?  Do you see

15  this Health Services Policy and Procedure?

16      A.    Yes.

17      Q.    This is a policy and procedure that was in

18  place during the time that you were the sheriff of

19  Muskogee County; is that correct?

20      A.    Yes.

21      Q.    And, No. 1, it says, "Inmates are screened

22  upon arrival at the jail by health-trained staff or

23  qualified healthcare personnel."  Do you see that?

24      A.    Yes.

25      Q.    And the purpose of that was to provide

EXHIBIT 17

1    continuity of care.  That's your understanding,

2    correct?

3         A.   Yes.

4         Q.   Okay.  And was that happening?

5         A.   Yes.

6         Q.   And that they were to identify those who

7    pose a threat to their own or other's health or safety

8    or who may require immediate medical interventions,

9    correct?

10        A.   Yes.

11        Q.   What steps were being taken at the Muskogee

12   County jail in 2018 to ensure that was happening?

13        A.   Within 48 hours of an inmate being brought

14   into the jail, they were seen by the medical staff and

15   talked over if they had any kind of preexisting

16   injuries, any health issues at the time.  Then a

17   treatment plan or whatever was done to help with their

18   medical conditions.

19        Q.   Do you see anywhere in the policy that

20   states you have 48 hours to screen an inmate to

21   determine whether or not they may require medical

22   intervention?

23        A.   Yes, I believe so.

24        Q.   Where do you see that in the policy?

25        A.   I don't know, but I've read it.

EXHIBIT 17

1     A.   No.

2     Q.   Do you believe that it was appropriate for

3  Mr. Patterson to never have his blood sugar taken at

4  the Muskogee County jail from the time he was admitted

5  until his death?

6     A.   I think that he should have had his blood

7  sugar taken.

8     Q.   He should have had his blood sugar taken

9  immediately upon admission, correct?

10     A.   Yes.

11     Q.   No. 1 and 2 indicates that, "Inmates shall

12  be refused admission to the jail if medically unstable

13  and sent to the hospital for evaluation and treatment.

14  Prebooking medical screening criteria are used to

15  guide the determination of medical stability and shall

16  be approved by medical authority and seen fit for

17  incarceration."  Do you see that?

18     A.   Yes.

19     Q.   What was, to your knowledge, the prebooking

20  medical screening?  How did the criteria -- how was it

21  used to determine whether or not an inmate was

22  medically stable?

23     A.   So that's the form that I was talking about

24  before.  I believe there was a form out on the back

25  door where people brought prisoners in.  There was

EXHIBIT 17

54

1   answering the questions"?

2      A.   Well, for example, like I said earlier, if

3   you're coming into the jail and I ask you if you have

4   blood pressure problems and you say, "No, I don't have

5   any," they are probably not going to take your blood

6   pressure.  If you had blood pressure problems, you're

7   going to say, "Yes, I have a problem," and then we're

8   going to go from there.

9      Q.   Well, when you say "go from there," wouldn't

10   you agree with me they should immediately have their

11   blood pressure assessed?

12      A.   Yes, at that time.  If they said they had

13   blood pressure problems, yes.

14      Q.   Also, if someone says they are diabetic,

15   they should have their blood sugar taken, correct?

16      A.   Yes.

17      Q.   They should have their vitals taken,

18   correct?

19      A.   Yes.

20      Q.   You understood an inmate who was presented

21   to the Muskogee County jail who was diabetic and had

22   identified as being diabetic were deemed to be

23   patients with special health needs or chronic care?

24      A.   Yes.

25      Q.   What was your understanding of the Muskogee

EXHIBIT 17

1    County jail's responsibility as it pertained to

2    evaluating special needs patients such as patients who

3    had identified as being diabetic?

4        A.    My understanding is that the intake officer,

5    when he asked the questions, if they did say they were

6    diabetic, for example, they would let the medical

7    personnel know as soon as possible.

8        Q.    Did you not have any expectation that the

9    medical personnel would review the intake screening

10   forms?

11       A.    Yes.

12       Q.    You had that expectation, didn't you?

13       A.    I would think so, yes.

14       Q.    And once it was identified that an inmate

15   was, in fact, special needs, special health needs or

16   needed chronic care, what did you understand the

17   policy of the Muskogee County jail to be?

18       A.    I believe they are put in a certain area,

19   and then they will see the medical personnel as soon

20   as possible to be able to get the proper care.

21       Q.    Okay.  Your policy states that "the HCP,"

22   that's the healthcare provider, "would evaluate all

23   special needs patients on a continuous basis to

24   determine the need for continued services, frequency

25   of periodic care assessments for special treatment and

EXHIBIT 17

56

1   to update the plan accordingly."

2           That's what your written policy states,

3   correct?

4       A.   Yes.

5       Q.   To your knowledge, was that happening?  Was

6   there a continuous monitoring of inmates with special

7   needs at the Muskogee County jail during your tenure

8   there?

9       A.   Yes.

10      Q.   Do you have any indication that

11  Mr. Patterson was continuously monitored after he

12  identified as being special medical needs?

13      A.   No.

14      Q.   Do you believe it was happening for other

15  inmates; it just didn't happen for Mr. Patterson?

16      A.   Yes.

17      Q.   Okay.  What evidence do you have to

18  substantiate that your medical staff was developing a

19  special needs treatment plan that was continuously

20  monitored?

21      A.   Just knowing, as I said before, going

22  through the day-to-day operations and talking to

23  medical staff, talking to inmates, and things like

24  that, knowing that they are being taken care of.

25      Q.    Where would their continuous needs be

EXHIBIT 17

1     Q.    We talked earlier at the beginning of the

2    deposition about the whited-out old Turn Key protocols

3    that were being used at the jail during your tenure

4    after Turn Key left.  Do you recall those questions?

5     A.    Yes.

6     Q.    I'm assuming that the whiting out and the

7    adoption of these policies and protocols by your jail

8    staff and medical staff after Turn Key left happened

9    soon after they left; is that right?

10     A.    Yes.

11     Q.    I want to look at Turn Key DDR2, 207.

12          MR. SMOLEN:  Jessica, can you hear me okay?

13          MS. DARK:  Yeah.  You said 207?

14          MR. SMOLEN:  Yeah.

15          MS. DARK:  Thanks.

16     Q.    (By Mr. Smolen) Do you know what a diabetic

17    flow sheet is?

18     A.    Not without looking at that, no.

19     Q.    Do you know the way in which the diabetic

20    flow sheet was to be used at the Muskogee County jail

21    during your tenure there?

22     A.    Not exactly, no.

23     Q.    Do you know who would have been responsible

24    for ensuring the diabetic flow sheet was adequately

25    maintained?

EXHIBIT 17

1      A.    Well, this report that I generated was for

2   criminal purposes.   There was also -- when I spoke

3   with District Attorney Loge, he advised that I do the

4   criminal side of the investigation and have someone

5   else, the undersheriff, Terry Freeman, do the inside

6   investigation to see what policies and stuff were.

7   So, I guess, the long answer is, yes, there were two

8   people terminated as a result of this investigation.

9      Q.    Okay.  Mr. Freeman did a separate

10  investigation; is that correct?

11     A.    I'm not for sure if he did or not.

12     Q.    I thought you just said he did the

13  investigation into the administrative policies and

14  violations?

15     A.    Well, he was supposed to, yes.

16     Q.    Well, did he?

17     A.    I'm not for sure.  I don't know if he went

18  off of my paperwork.  I'm not for sure.

19     Q.    It's possible that your criminal

20  investigation was also used to discipline employees

21  who you felt like were in violation of policy?

22     A.    Yes.

23     Q.    And what employees did you discipline?

24     A.    Robert Reynolds and Jody Matthews.

25     Q.    And what was the basis for your decision to

EXHIBIT 17

78

1   discipline them?

2       A.   They were the supervisors on shift at the

3   time, and they were ultimately responsible for what

4   happened at the jail and what their employees that

5   worked under them did or didn't do.

6       Q.   There were numerous violations by your

7   medical staff.  We've gone through those, correct?

8       A.   I don't know that there was at that time.

9       Q.   What do you mean you don't know if there was

10  at that time?

11      A.   Because they didn't know he was diabetic.

12      Q.   The policies required them to know, correct?

13      A.   Yes.

14      Q.   They failed to follow the policies and learn

15  of his diabetic condition, correct?

16      A.   No.

17      Q.   Can you explain what you mean by "no" to the

18  jury?

19      A.   Yes.  So the intake officer was asking the

20  questions.  Mr. Patterson did say that he was

21  diabetic, so it is noted on the intake sheet.  So at

22  that point in time, the intake sheet, instead of him

23  notifying medical personnel as soon as possible like

24  he's supposed to, he just put it in the file with the

25  other intake sheets for them to review, and within 48

EXHIBIT 17

1   hours they will get those sheets, and they will see

2   the inmates and see what their condition is.  So, at

3   the time, they did not know he was diabetic.

4        Q.   Sir, your policy required them to actually

5   review his intake and his medical file, correct?

6        A.   Yes.

7        Q.   They did not do that, correct?

8        A.   Not at that time, no.

9        Q.   That was a policy violation, correct?

10       A.   No, it was not.

11       Q.   You don't view that to be a policy

12   violation?

13       A.   No.

14       Q.   We'll get back into that here in a minute.

15       A.   Okay.

16       Q.   DO Steven Gilley, you said he failed to

17   provide information to medical staff, correct?

18       A.   Yes.

19       Q.   Policy violation, correct?

20       A.   Yes.

21       Q.   Did you discipline Steven Gilley?

22       A.   I don't believe he was disciplined, no.

23       Q.   Even though you acknowledge he was in

24   violation of the policy?

25       A.   Yes.

EXHIBIT 17

87

1   chest pain," all of those.

2      Q.   (By Mr. Smolen) Sir, the document indicates the

3   guidelines for FITS, yes?

4      A.   Yes.

5      Q.   Those are guidelines for initial admission

6   into this facility, correct?

7      A.   Yes.

8      Q.   Not for special needs inmates but for all

9   inmates, correct?

10      A.   Correct.

11      Q.   You and I can agree that the document

12   indicates, No. 4, that if the blood pressure is over

13   180 over 100, they should not be admitted, correct?

14      A.   That's correct.

15      Q.   The document indicates, if they have an

16   FSBS, a finger stick blood sugar test, over 500, they

17   should not be admitted, correct?

18      A.   Yes.

19      Q.   The document indicates if they have an O2

20   saturation under 88 percent they should not be

21   admitted into your facility, correct?

22      A.   That's correct.

23      Q.   And it's been your practice at the Muskogee

24   County jail during the time that it was your tenure

25   there to not require vital signs be taken on all

EXHIBIT 17

1          MR. SMOLEN:  Steve Gilley?

2      Q.   (By Mr. Artus) When he told Steve Gilley he was

3  diabetic, Gilley should have reported that to Petroski;

4  is that correct?

5          MR. SMOLEN:  Objection to form.

6          THE WITNESS:  Correct.

7      Q.   (By Mr. Artus) Petroski should, on her own,

8  have looked at the intake form herself, right?

9      A.   Yes.

10     Q.   And that was violation of policy, wasn't it?

11     A.   Yes.

12     Q.   With regard to the hourly checks not being

13 done, if they weren't doing the hourly checks, that

14 would have been a violation of policy, and you

15 disciplined people for that, right?

16     A.   Yes.

17     Q.   And -- but we also -- at the jail you also

18 have a backup that somebody is watching the videos in

19 that jail the whole time, right?

20     A.   Yes.

21     Q.   I mean, I understand there are other videos

22 they are watching, too, but there's another set of

23 eyes on there, too, not just the hourly checks, right?

24     A.   Correct.

25     Q.   If someone saw Mr. Patterson throwing up and

EXHIBIT 17

1   didn't report it to medical, that would have been a

2   violation of policy, too, correct?

3        A.   Yes.

4        Q.   And with regard to Nurse Ellen, when she was

5   called down there on Monday at 10:00 a.m. and she

6   started to do her assessment and then she left, should

7   she have looked him up to see what his medical intake

8   form said?

9        A.   Yes.

10       Q.   If she didn't, would that be a violation of

11  your policy?

12       A.   Yes.

13       Q.   We've taken the deposition of APRN Smith,

14  and he testified that he reviewed the policies that

15  were in place for Turn Key prior to them being

16  approved by you at the jail; is that your memory?

17       A.   Yes.

18       Q.   So did you get -- did you consult with him

19  to find out are these going to be okay to keep using?

20       A.   Yes.

21       Q.   And with regard to the medical supervisor

22  being Nurse Ellen, is there any requirement from the

23  State or the jail inspector that you have a doctor

24  versus an LPN being in charge of the medical?

25       A.   No.

EXHIBIT 17

1      Q.    Is there any requirement by the State or the

2  jail inspector that you have a doctor as opposed to an

3  APRN being a healthcare provider?

4      A.    No.

5      Q.    With regard to incidents at the jail since

6  you took office, when did you say -- that was in

7  January of 2017?

8      A.    Yes.

9      Q.    Through the time when Mr. Patterson passed

10  away on June 18th, 2018, was there an ongoing or a

11  problem at the jail with misidentifying people who

12  came in who are diabetic and the jail not being able

13  to recognize, hey, these are diabetics and confusing

14  them with someone who is intoxicated; is that a

15  problem that has happened?

16      A.    No.

17      Q.    Is this the first incident that has occurred

18  since you were sheriff?

19          MR. SMOLEN:  Objection.  Form.

20          THE WITNESS:  Yes.

21      Q.    (By Mr. Artus) With regard to the jail, does it

22  have an area in the jail where medical exams are done or

23  taken like for doing sick call?

24      A.    Yes.

25      Q.    And with regard to the plan -- the health

EXHIBIT 17

1  care plan at the jail, is the health care plan at the

2  jail involved in doing sick calls every day, Monday

3  through Friday with an LPN?

4          MR. SMOLEN:  Objection to form.

5          THE WITNESS:  Yes.

6     Q.   (By Mr. Artus) Does it also include sick calls

7  with APRN Nurse Smith on Tuesdays through Fridays at the

8  time of this incident?

9          MR. SMOLEN:  Object to the form.

10         THE WITNESS:  Yes.

11    Q.   (By Mr. Artus) And did it also require and

12  provide for Nurse Smith to diagnose and prescribe

13  medications for inmates who had conditions that needed

14  that?

15         MR. SMOLEN:  Object to the form.

16         THE WITNESS:  Yes.

17    Q.   (By Mr. Artus) And did it require that the

18  medical staff chart the treatment that they gave to the

19  inmates?

20         MR. SMOLEN:  Object to the form.

21         THE WITNESS:  Yes.

22    Q.   (By Mr. Artus) And did the jail send inmates

23  out to other providers if recommended by Nurse Smith?

24         MR. SMOLEN:  Object to the form.

25         THE WITNESS:  Yes.

EXHIBIT 17