IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

FLOYD PATTERSON, JR.,          )
as Special Administrator       )
of the Estate of FLOYD         )
PATTERSON, III,                )
deceased,                      )
          Plaintiff,           )
                               )
vs.                            )Case 20-CV-040-RAW
                               )
TERRY FREEMAN, in his          )
official capacity,             )
et al,.                        )
          Defendants.          )


DEPOSITION OF
RACHEL PETROSKI


DATE:   SEPTEMBER 29, 2021

REPORTER:   MARISA SPALDING, CSR, RPR


Spalding Reporting Service, Inc.
1611 South Utica Avenue, Box 153
spaldingreportingservice@cox.net
Tulsa, Oklahoma 74104
(918) 284-2017

PLAINTIFF'S
EXHIBIT
7

1   Q   Okay.   Have you quit any of those
2   employers?
3   A   Yes.
4   Q   Okay.   And I want you to walk me
5   through every employer you had and the
6   reason that you quit.
7   A   The Springs.   They mistreated their
8   employees.   At Grace I did quit because
9   they built the new facility and we
10   transferred patients from the old to the
11   new.   M Street, I don't -- I'm not sure why
12   I quit there.   I think it was pay.   And
13   then Dogwood, I had a baby.   And Broadway
14   Manor -- I don't remember why I quit there.
15   I think I just moved on from there.
16   Q   Okay.   Anywhere else?
17   A   Not that I recall.
18   Q   Have you ever referred to yourself
19   as a nurse?
20   A   No.
21   Q   Because you're not a nurse, right?
22   A   No.
23   Q   Correct, you're not a nurse?
24   A   No, I'm not.
25   Q   Have you ever heard people refer to

1    Q    (By Mr. Smolen)  Ma'am, it's true,
2  is it not, that when you were asked on your
3  Muskogee County Jail application that if
4  you had ever used marijuana or any other
5  drugs not prescribed to you by a physician,
6  you answered no?
7    A    Right.
8    Q    And isn't it true that that's not
9  -- that's not true?
10    A    Yes, it's --
11    Q    It's a lie?
12    A    Right.
13    Q    Okay.  And why should a jury
14  believe you if you're willing to lie on
15  your job application?  Why should a jury
16  believe anything you have to say?
17              MR. ARTUS:  Object to the form.
18              THE WITNESS:  I don't -- I've
19  never been -- I don't know.  I've never had
20  to do jury court.
21    Q    (By Mr. Smolen)  You lied on your
22  job application about your drug use,
23  correct?
24    A    Correct.
25    Q    Okay.  Why should a jury -- if we

1  them no when you knew you had been a daily
2  marijuana smoker?
3      A    I filled that out in a hurry
4  because I was hired like that day.
5      Q    Okay.  So you filled it out in a
6  hurry in a dishonest way, agreed?  It
7  didn't take you any longer to write down
8  yes, did it?
9      A    I mean, obviously, I didn't read
10  the question.
11      Q    Okay.  Why do you say obviously?
12      A    Because I'm not a liar.
13      Q    So you thought just by filling in
14  the answers without reading the questions
15  --
16      A    Quickly, right.
17      Q    -- that was okay?
18      A    Correct.
19      Q    That's what you're going to tell
20  the jury?
21      A    Uh-huh, yes.
22      Q    Can you read on the bottom part
23  there -- can you read to the jury what it
24  is that you certified on this page -- piece
25  of paper that you lied on?  Just read that

1   part.

2      A    The jury?

3      Q    Yeah, we're going to play this to

4   the jury maybe, your transcript, okay, and

5   so I want to have you read this portion on

6   your job application that you certified.

7      A    I certify that all statements made

8   in the questionnaire are true, complete and

9   correct to the best of my knowledge and

10  belief and are made in good faith.  I

11  understand that my -- or that any false

12  information, misstatement or omission of

13  materials may subject me to

14  disqualification from consideration for

15  employment or dismissal.

16     Q    So you -- not only did you answer

17  no and lie about your marijuana use, you

18  certified that it was a true statement?

19     A    Uh-huh.

20     Q    Yes?

21     A    Yes.

22     Q    And you signed off on it on 12/29

23  of '17?

24     A    Yes.

25     Q    Okay.  So, again, you lied because

1   now you're telling me that you didn't

2   really read the questions and that you just

3   quickly wrote the answers down.  So you've

4   lied twice now?

5       A    Yes.

6            MR. ARTUS:   Object to form.

7       Q    (By Mr. Smolen)  Right?

8       A    Yes.

9       Q    Okay.  So you've lied multiple

10  times in your job application, right?

11      A    Yes.

12      Q    But you still think a jury should

13  believe what you have to say?

14      A    Yes.

15      Q    Ma'am, I'm going to have you look

16  at Page 6 of your application.

17           MR. SMOLEN:   Andy, in your

18  production, it's 50 -- Page 51.

19           MR. ARTUS:   All right.

20      Q    (By Mr. Smolen)  Do you recall

21  filling out the legal section of your

22  application?

23      A    Yes.

24      Q    It says:  If you have ever been

25  arrested or convicted of any crime,

1   bunch of money to get it expunged.

2       Q    So you could then lie about it on a

3   job application?

4               MR. ARTUS:   Object to the form.

5               THE WITNESS:   No.

6       Q    (By Mr. Smolen)   Because this

7   doesn't ask you about anything other than

8   whether you've been arrested?

9       A    It doesn't ask about when you were

10  a juvenile.

11      Q    Ma'am, how old were you in 2005

12  when you got arrested?

13      A    2005, I was 20...

14      Q    Five?

15      A    Yeah, 23.

16      Q    Well, if you were born in 1980 --

17      A    I'm not good at math.

18      Q    That's okay.   We all have our

19  weaknesses.   You were arrested in 2005,

20  ma'am, and you lied about it in your

21  application, correct?

22      A    Correct.

23      Q    You were arrested in 2000?

24      A    Uh-huh.

25      Q    And you lied about it in your

1   application.  You weren't an adult then.
2   You were 20?
3       A   Okay.
4       Q   You lied about those, correct?
5       A   I just don't remember the exact
6   times.  I don't --
7       Q   I have it in your background check.
8       A   Okay.  Well, they -- they could
9   have pulled it up.
10      Q   Okay.  Ma'am, you weren't honest
11  with them about your legal issues in the
12  past, fair enough?
13      A   Fair enough.
14      Q   Okay.  And, again, you still think
15  the jury should take your word for what
16  you're saying happened to Mr. Patterson?
17      A   Yes.
18      Q   Okay.  But you lied about this
19  stuff, but you're not lying about anything
20  else?
21      A   This has nothing to the do with Mr.
22  Patterson.
23      Q   Well, it has to do with your
24  honesty.
25      A   And the stuff that happened to him

49

1   arrest because your driver's license was
2   suspended?
3       A    No, from the DUI.
4       Q    Who made the decision to hire you
5   at the Muskogee County Jail?
6       A    Ellen and Melissa Jackson.
7       Q    Did they do a job interview?
8       A    Yes.
9       Q    Did they go over your application
10  with you?
11      A    What do you mean did they go over
12  it?
13      Q    When you filled out this
14  application that we've been covering, did
15  Ellen and Melissa Jackson go over it with
16  you?
17      A    They sat me down and interviewed
18  me.
19      Q    And did they go over the
20  application that you filled out?
21      A    I don't recall.  It was sitting
22  there filled out.
23      Q    And what position were you hired
24  into at the jail?
25      A    CMA.

1    Q    And the jail had a CMA position?

2    A    Yes.

3    Q    And what was your job description

4  as a CMA at the Muskogee County Jail?

5    A    Certified medication assistant.

6    Q    What was your job description?

7    A    Certified medication assistant.

8    Q    That's the title of your job?  What

9  were you required to do in a CMA position?

10    A    Medication to the inmates.

11    Q    Did you have a written job

12  description?

13    A    Did I have a written job

14  description?  I mean, that's what I was

15  hired for.

16    Q    That's not my question.  Did they

17  provide you with a written job description?

18    A    I don't know what you're asking.

19    Q    Muskogee County Jail CMA, okay?

20    A    Whoa, you don't need to yell at me.

21    Q    Did they give you a job description

22  as to what that included?

23    A    In --

24    Q    I just don't want to waste my time

25  and everyone else's time --

1   certified medical assistant?

2       A    No.

3       Q    Okay.  You are just a certified

4   medication aide?

5       A    Yes.

6       Q    Okay.  And you understood that to

7   be your position at the jail is a certified

8   medication aide?

9       A    Right.

10      Q    Okay.  And did you ever have a

11  position outside of that?

12      A    What do you mean?

13      Q    Did you ever -- were you ever asked

14  to act like a nurse?

15      A    No.

16      Q    Okay.  Were you ever asked to serve

17  as like some kind of CNA?

18      A    No.

19      Q    Okay.  It was always your position,

20  as you understood it, was always a

21  certified medication aide?

22      A    Yes.

23      Q    You're not a certified nursing

24  assistant, correct?

25      A    Yes, that's what a CNA is.

1    A    They don't do that anymore.

2    Q    But online --

3    A    It's old school.

4    Q    I'm looking at your online state

5 certifications, okay?

6    A    Correct.

7    Q    And you're listed as certified

8 medication aide?

9    A    Uh-huh.

10    Q    You're listed as a home health

11 aide?

12    A    Right.

13    Q    And you're listed as a long term

14 care aide?

15    A    Right.

16    Q    Okay.  Those are the three

17 certifications you hold?

18    A    Correct.

19    Q    Okay.  And just to make sure we're

20 clear on the record, you never served,

21 while employed at the Muskogee County Jail,

22 in any other position other than a

23 certified medication aide, yes?

24    A    Correct.

25            MR. SMOLEN:  Okay.  I want you

66

1   to get to -- let's go to Exhibit 11.  This
2   is our Exhibit 11.
3       Q    (By Mr. Smolen)  Have you read
4   this, ma'am?
5       A    I looked over it.  I can read it
6   now.
7       Q    You have looked over it?
8       A    Read -- like I just skimmed over
9   it.
10      Q    Okay.  Well, let's go to the second
11  paragraph, okay?  The last sentence says:
12  I then had medical nurse, Rachel Petroski,
13  to come down and do an assessment on
14  Patterson to see if we could accept him?
15      A    Right.
16      Q    Is that a true statement?
17      A    I don't know.
18          MR. ARTUS:  Who's statement is
19  that?
20          MR. SMOLEN:  It's Robert
21  Reynolds.
22          THE WITNESS:  Robert Reynolds.
23          MR. ARTUS:  Okay.
24      Q    (By Mr. Smolen)  Well, we know that
25  you're not a medical nurse, right?

1    A   Right.

2    Q   And -- and you don't know why
3  Robert Reynolds thought you were?

4    A   No.

5    Q   Okay.  But did you in fact -- were
6  you, in fact, asked to come down and do an
7  assessment on Floyd Patterson?

8    A   I came down -- they asked me to do
9  -- to see if we were able to take him.

10    Q   To do an assessment to see if the
11  jail would --

12    A   I didn't assess him because at the
13  time I didn't -- I don't do assessments.
14  That's the nurses.

15    Q   Okay.  So Mr. Reynolds is lying
16  about what happened?

17          MR. ARTUS:  Object to the form.

18          THE WITNESS:  He's lying that I
19  was a nurse.

20    Q   (By Mr. Smolen)  And he's also
21  lying that he asked you come do an
22  assessment?

23    A   I don't remember who called me
24  down.

25    Q   But you're saying no one called you

1  to do an assessment?

2     A   I didn't say that.

3     Q   Okay.  Were you called down to do

4  an assessment on Mr. Patterson?

5     A   I was called down to see if we

6  could accept him.  They wanted my opinion.

7     Q   Okay.  But that's outside of your

8  job description?

9     A   Not at the time --

10    Q   Well --

11    A   -- because I was the only person in

12  medical there on a Sunday.

13    Q   Okay.  So there's -- there's

14  exceptions to your written job description?

15    A   Yes.

16    Q   Okay.  And you're allowed to

17  practice outside of your written job

18  description when?

19    A   When I -- at the time, I didn't

20  know this.  But now, if I'm by myself, that

21  I need to call the doctor on.

22    Q   I'm talking about then.  You were

23  allowed to practice outside your written

24  job description when Mr. Patterson

25  presented to the jail?

1    A    I said that he looked like he was
2  inebriated.
3    Q    Not my question.  You were allowed
4  to make a determination as to whether or
5  not a person was medically fit to enter the
6  Muskogee County Jail when Mr. Patterson --
7    A    Uh-huh.
8    Q    -- presented to the jail, correct?
9    A    Right.
10   Q    Even though that's not part of your
11 written job description?
12   A    Right.
13   Q    Correct?
14   A    Right.
15   Q    Okay.  And you were allowed to
16 practice outside of your written job
17 description by your supervisors on what
18 occasions?  When were you allowed to
19 practice --
20   A    There's no nurses on the weekends.
21   Q    So if there's no nurse, you get to
22 act as if you're the nurse on staff?
23   A    No.
24   Q    Well, you get to do assessments?
25   A    I don't do assessments.  I just let

1  them know that we can accept people.

2     Q   Well, don't you have to do a

3  medical assessment before?

4     A   Well, if I'm told about their

5  information and their medical needs.

6     Q   Ma'am, what are you told -- you're

7  told that -- now things are different; is

8  that right?  You're not allowed to do

9  assessments or admit somebody into a jail?

10    A   My job now --

11    Q   Yeah.

12    A   -- or then?

13    Q   Now?

14    A   Now I don't have to do it.

15    Q   And what changed?

16    A   Knowledge of the job.

17    Q   Now you know you're not allowed to

18  do what you did with Mr. Patterson?

19    A   Correct.

20    Q   Okay.  And who made you aware of

21  that?

22    A   Over the years, we've just

23  progressed and I've gotten better.  I was

24  new CMA, new to the job.

25    Q   But no one at the job who had been

1  there for an extensive period of time had a

2  problem with you making a determination as

3  to whether or not an inmate was medically

4  fit to enter a jail, correct?

5      A    Correct.

6      Q    On how many occasions did you do

7  that?

8      A    I don't recall.

9      Q    I mean, it seems like it was pretty

10  routine?

11      A    I mean, I would have to go back and

12  -- what days I worked and who worked and...

13      Q    We can assume that it was every

14  time it was a weekend, right?  You were the

15  only one there?

16      A    I didn't work every weekend.

17      Q    Okay.  Ma'am, it's true that you've

18  probably done this dozens and dozens of

19  times before you were told to not do it

20  anymore, fair?

21      A    Maybe not dozens but a few.

22      Q    Okay.  And who told you -- you

23  could no longer do that?

24      A    My boss.

25      Q    Who's your boss?

1   A     Ellen.

2   Q     And when did Ellen tell you this?

3   A     When we started having issues with

4   the officers bringing in people that were

5   inebriated.

6   Q     Was it after Mr. Patterson's case?

7   A     I don't recall.

8   Q     And why did the -- and why did it

9   change?  Why did the jail change their

10  practice of allowing you to make a

11  determination --

12  A     We have new rules every day.  I

13  mean, it changes daily.

14  Q     Okay.  When you say you have new

15  rules every day, it changes daily, who

16  changes the rules at the facility on a

17  daily basis?

18  A     It depends on who's there.

19  Q     Who are the people that would

20  generally change them?

21  A     Administration.

22  Q     Who in administration changed the

23  rules on a daily basis?

24  A     People that worked in

25  administration.

1 number?

2        MR. SMOLEN:  It's DDR #37.

3 It's Exhibit -- I have it as 1.

4        MR. BEN KELLER:  Our Exhibit 1.

5 It's Bates 14.

6        MS. DARK:  14, thank you.

7        MR. BEN KELLER:  Yeah.

8    Q   (By Mr. Smolen)  Do you have that

9 in front of you?  He writes that Supervisor

10 Reynolds calls for Rachel in medical to

11 come triage Mr. Patterson.  Are you allowed

12 to triage a patient?

13    A   I am now.  I've been trained in it,

14 how to do it.

15    Q   Okay.  Were you allowed to do it

16 then?

17    A   Previously?

18    Q   Yeah.

19    A   No.

20    Q   But you did with Mr. Patterson

21 because you were the only one on the floor

22 from the medical team?

23    A   Right, on that day.

24    Q   So because of the lack of nursing

25 staff at the facility, you had to do a

1   triage of Mr. Patterson during the intake

2   process, correct?

3       A    Right.

4       Q    And it says:   Rachel came down to

5   intake and cleared Inmate Patterson for

6   acceptance, correct?

7       A    Correct.

8           MR. SMOLEN:   Let's go ahead and

9   get the video cued up so we can watch that.

10          MR. ARTUS:   What exhibit is

11  that?

12          MR. BEN KELLER:   41?

13          MR. ARTUS:   And you're going to

14  send all these to the court reporter like

15  we always do?

16          MR. BEN KELLER:   Yeah.  I think

17  14, 15 and 21 have already been used, but

18  I'll just send them.

19          MR. ARTUS:   Okay.

20      Q    (By Mr. Smolen)  Ma'am, you've

21  reviewed this video prior to today,

22  correct?

23      A    Yes.

24          MR. SMOLEN:   We're going to

25  watch it one time through.   Just turn the

1   volume up.

2                    (Video playing)

3       Q     (By Mr. Smolen)  Ma'am, is that you

4   that we see entering the room?

5       A     Yes.

6       Q     And you're wearing blue scrubs?

7       A     Yes.

8       Q     Is that a typical uniform that you

9   wear at the jail?

10      A     Yes.

11      Q     Who provided you -- were you

12  provided with that uniform --

13      A     No.

14      Q     -- or something that you have?

15      A     Have.

16          MR. SMOLEN:  Go ahead.

17      Q     (By Mr. Smolen)  And -- and before

18  we get to this point, how were you -- why

19  were you coming down to booking?

20      A     They had called me to come down.

21      Q     Okay.

22      A     Earlier -- somebody -- not Reynolds

23  -- I think it was Gilley that called me

24  down.

25      Q     Okay.  Gilley is the officer who

1  performed the intake?

2      A    Yeah.

3      Q    Okay.  We can't see him in the

4  video but we can hear him asking questions,

5  correct?

6      A    Correct.

7      Q    And did you understand that he was

8  a supervisor or that Reynolds was a

9  supervisor?

10     A    I don't remember at the time.

11     Q    Okay.  What did they ask you to do

12  specifically?

13     A    I can't remember specifically, but

14  I believe it's to come down and see if I

15  would accept him or not.

16     Q    Clear him for the jail?

17     A    Yeah.

18     Q    There's been testimony in multiple

19  depositions -- you might have reviewed it

20  during your preparation for the deposition

21  -- that there was a sheet of paper on the

22  door that essentially said look don't admit

23  anyone who has these types of issues.  Do

24  you know what they're talking about?

25     A    On the back -- the back door?

1    Q    Yeah.

2    A    Yeah.

3    Q    What do you recall that sheet of

4  paper saying?

5    A    It says if they can't walk in on

6  their own recogent -- is that right -- that

7  word -- right -- recognizance, I think.

8  Anyway, if they can't walk into the

9  facility, then the officers need to turn

10  around and take them to be cleared for

11  incarceration at the hospital.  But I know

12  that now very well.  Then at that moment, I

13  did not.

14    Q    Okay.

15    A    But I was --

16    Q    There's a list of factors on the

17  sheet of paper at least as people have

18  described it?

19    A    I don't remember what it says,

20  yeah.

21    Q    It talks about like high blood

22  pressure or certain issues that might be --

23    A    Yes.

24    Q    -- discovered during the

25  assessment.  Don't admit them if they have

1  these conditions?

2      A    Conditions, yeah.

3      Q    You weren't trained on that at the

4  time?

5      A    No.

6      Q    Okay.  Is that -- I'm sorry, it's

7  double negative question.  At the time

8  Mr. Patterson was booked into the jail,

9  it's correct that you were not trained on

10  that at the time?

11     A    Correct.

12     Q    Okay.  You've now been trained on

13  it?

14     A    Yes, yes.

15     Q    How recently were you trained on

16  it?

17     A    Let's see.  That was in 2108, so I

18  want to say like the end of 2018 after this

19  incident.

20     Q    Okay.  After this incident?

21     A    Yes.

22     Q    Were you the only one trained on it

23  or were other people trained on it?

24     A    I'm not sure.

25     Q    Okay.  Did you understand the

1   training had to do with -- with essentially
2   what was discovered during the
3   investigation into Mr. Patterson's death?
4       A   No, I did -- at the time, I didn't
5   know that he had passed away.
6       Q   Okay.
7                   (Video playing)
8       Q   What were you told by Officer
9   Rochell, who we see in the video, about
10  Mr. Patterson during this interaction?
11      A   I don't remember talking to him.
12      Q   Okay.  Who told you what
13  Mr. Patterson had been arrested for?
14      A   If you go back a little bit, I
15  asked Reynolds.  I think I asked him either
16  is he on something or what's he here for?
17  And he said -- what did he say?
18      Q   Well, we can back up.
19              MR. SMOLEN:  Why don't you back
20  it up turn it up a little bit louder.
21              THE WITNESS:   I can't remember
22  what he said when I asked him.
23                  (Video playing)
24              THE WITNESS:  Tweaking.
25                  (Video playing)

1       THE WITNESS:  Is that -- is
2  that the officer talking?
3                 (Video playing)
4     Q   (By Mr. Smolen)   At this point in
5  time, have you already cleared
6  Mr. Patterson?
7     A   Yeah, I believe so.
8     Q   Because they're reading off -- and
9  that's at 8 -- 8:37 a.m., they're reading
10  off the rules of incarceration, it sounds
11  like, at the facility to Mr. Patterson?
12     A   Yes.
13     Q   So that would say to us that he's
14  already been told that he's going to be
15  admitted?
16     A   Yes.
17     Q   Okay.  So I want to go back and --
18  before this time.  And what did you do to
19  assess Mr. Patterson?
20     A   I just checked over his eyes and
21  made sure he could understand me clearly
22  and speak verbally.
23     Q   Let's go back and look at that.
24  Were you told that they thought he was
25  intoxicated or withdrawing?

1  nurse look over you --
2      A    Uh-huh.
3      Q    -- you don't tell Mr. Reynolds in
4  the video, hey, I'm not a nurse?
5      A    No, not at the time.
6      Q    Okay.
7                   (Video playing)
8              MR. SMOLEN:   Pause it right
9  there.
10     Q    (By Mr. Smolen)  What were you
11 going to do?
12     A    I was going to help him take off
13 his jewelry.
14     Q    Okay.
15     A    And then Reynolds pushed my hand
16 away.
17     Q    And told you not to touch him
18 unless you had gloves on?
19     A    Yes.
20     Q    Okay.
21     A    I was trying to help him out.
22     Q    Okay.  You were just trying to help
23 get his jewelry off.
24     A    Uh-huh.
25                   (Video playing)

1    Q    All right.   What does Mr. Reynolds
2  ask you there?
3    A    He said is he good -- I don't know
4  if says -- calls me babe or something --
5  and then I said, yeah, yeah.
6    Q    Okay.   So at this point in time, at
7  8:37 and one second, you've completed your
8  assessment to allow Mr. Patterson in the
9  jail?
10    A    To stay, yes.
11    Q    I want to look at --
12         MR. SMOLEN:   It's our Exhibit
13  15, Ben, at 167.
14         MR. BEN KELLER:   Yeah, it's our
15  --
16         MR. SMOLEN:   Or 14, I'm sorry.
17    Q   (By Mr. Smolen)   There was a health
18  services policies and procedures titled
19  Detoxification, okay?   It was No. J19.   Do
20  you recall reviewing this prior to your
21  deposition?
22    A    Did you give me that paper?
23         MR. BEN KELLER:   It's DDR 2,
24  Page 167.
25    Q   (By Mr. Smolen)   Do you recall

95

1   there being a detoxification policy and
2   procedure at the jail?
3       A    If there is, I didn't read it.
4       Q    Okay.
5       A    I haven't -- I don't think I -- I'm
6   not 100 percent sure.  Is this -- okay.
7   Oh, it's in the policy and procedures,
8   okay.
9       Q    You see it's in the policies and
10  procedures for the Muskogee County
11  Detention Center?
12      A    Yeah.
13      Q    Okay.  Did you know that this
14  policy existed at the time that
15  Mr. Patterson was booked into the jail?
16      A    No.
17      Q    Don't you think it would have been
18  important for you to have been informed
19  about this policy and procedure
20  specifically about the detoxification
21  process prior to Mr. Patterson being booked
22  in?
23      A    Yes.
24      Q    Okay.  See here it says here:  All
25  persons entering the jail are evaluated for

1   the risk of alcohol and/or drug

2   intoxication and withdrawal and provided

3   with treatment if clinically indicated,

4   correct?

5       A    Correct.

6       Q    You weren't aware of that at the

7   time Mr. Patterson was book into the jail,

8   correct?

9       A    Correct.

10      Q    Okay.  No. 2 says:  Established

11  protocols are followed for the treatment

12  and observation of individuals manifesting

13  symptoms of intoxication or withdrawal.

14  Protocols are approved by the medical

15  director, are current and are consistent

16  with nationally accepted guidelines.

17      Were you aware at the time

18  Mr. Patterson was booked into the Muskogee

19  County Jail that whether -- one way or the

20  other, whether there were protocols in

21  place that pertained to the intoxication or

22  withdrawal that an inmate might be having?

23      A    Say that one more time.

24      Q    Were you aware at the time

25  Mr. Patterson was booked into the Muskogee

1   County Detention Center, one way or the

2   other, whether there were any protocols

3   that existed that specifically pertained to

4   the withdrawal or intox -- intoxication --

5       A    No.

6       Q    -- protocol as it pertained to an

7   inmate being booked?

8       A    No.

9       Q    Okay.  No. 4 states:  Patients

10  experiencing severe life-threatening

11  intoxication, overdose or withdrawal are

12  transferred immediately to a licensed

13  community hospital.  Did you know that that

14  was a policy at the time?

15      A    Yes.

16      Q    Okay.  And if you were told that

17  Mr. Patterson was withdrawing, why did you

18  not have him transferred to a community

19  hospital?

20      A    Nobody said he was withdrawing.

21  They said he was tweaking.

22      Q    When were you told he was

23  withdrawing?

24              MR. ARTUS:  Object to the form.

25              THE WITNESS:  I was never

1   in.  And when they're on camera, they're --
2   I know that main control is supposed to
3   check on them every 15 minutes and...
4       Q    Check on them?  What do you mean by
5   check on them?
6       A    Like they'll look at the -- they'll
7   look on the cameras, they'll look on their
8   screen downstairs, and then they'll call in
9   like, hey, are you okay?  What's going on?
10  Can we get you anything?  But, I mean, I
11  don't know their whole job title.
12      Q    I want you to look at Page 2.
13  Under Management, it says:  If the
14  following conditions exist, the patient
15  will be sent to the hospital for medical
16  treatment.  Patient with unstable vital
17  signs or that is unresponsive, correct?
18      A    Correct.
19      Q    Okay.  You never took Mr.
20  Patterson's vital signs, agreed?
21      A    Agreed.
22      Q    Okay.  You would have to take their
23  vital signs before you would know whether
24  or not they were unstable, correct?
25      A    Correct.

1    Q    Okay.  So it's fair to say that you
2  weren't compliant at least with this policy
3  as it pertained to Mr. Patterson?
4    A    I wasn't aware.
5    Q    And now that you are aware --
6    A    Yes.
7    Q    -- you would agree with me that
8  because we know you didn't take vital
9  signs, you did not act consist with this --
10 at least this written policy?
11   A    Right.
12   Q    Had anyone ever trained you, taught
13 you, told you, that you had to take an
14 inmate's or potential arrestees vital signs
15 before admitting them into the jail?
16   A    No.
17   Q    Okay.  Do you understand that now?
18   A    Yes.
19   Q    Okay.  When did you learn that and
20 by whom?
21   A    Nurse Ellen, and it was probably a
22 good year after I started.
23   Q    Okay.  How long after
24 Mr. Patterson's death, did that policy
25 change or that practice change?

1  was a diabetic, do you?

2      A    I did not know that.

3      Q    That's not my question.  Are you

4  disputing that Mr. Patterson disclosed he

5  was diabetic?

6      A    Am I disputing it?

7      Q    Yes.

8      A    I didn't know.  No one told me.

9      Q    You know now, though, that

10 Mr. Patterson disclosed he was diabetic?

11     A    Uh-huh.

12     Q    Correct?

13     A    Yes.

14     Q    Yeah, okay.  And despite disclosing

15 that he was diabetic during the screening

16 process, you, as the health care provider,

17 never came up with any individual treatment

18 plan, correct?

19     A    No.

20     Q    What's the procedure, ma'am, that

21 you're supposed to follow, at least

22 according to this written policy, as it

23 pertains to inmates who have been

24 identified as having a chronically ill

25 condition?

138

1    A    Well, if I was notified that he was
2 diabetic, I would have took certain steps
3 to get him treated, but I was never
4 notified.
5    Q    And you took no steps to review the
6 screening intake form?
7    A    No, I never look at those.  I don't
8 even know where they go.
9    Q    You're saying if you had been told
10 he was diabetic, you would have put
11 together a treatment plan; is that fair?
12    A    I can't put together a treatment
13 plan, but I can call a nurse that can
14 because I'm not a nurse.
15    Q    Well, this isn't limited to nurses,
16 though, is it?
17    A    I'm not sure.  I can't answer that
18 question.
19    Q    Well, it just says health care
20 provider, right, which you've identified
21 yourself as that?
22    A    Yeah.  But me, I don't have any
23 specialized training.
24    Q    Well, you got a couple of weeks
25 under your belt, right?

1    Subsection 1?

2      A    I was never --

3      Q    Ma'am, what --

4      A    Can I answer your question?

5      Q    Well, there isn't a question

6    pending.

7      A    You just asked me a question.

8      Q    No, I asked you to look at

9    Subsection 1.

10            MR. ARTUS:   Let him finish his

11   question.

12     Q    (By Mr. Smolen)   I want to read to

13   the jury what the written procedure was at

14   the Muskogee County Jail when Mr. Patterson

15   was booked in prior to his death as it

16   pertained to the receiving screening

17   process?

18     A    Which part?   Starting there?

19     Q    Yeah.

20     A    During the receiving screening

21   process, health care staff will identify

22   patients with special health care needs and

23   refer them for the appropriate treatment

24   planning.

25     Q    There we go.   During the receiving

142

1   screening process, health care staff --
2   that's you, right?
3        A    Correct.
4        Q    Okay.  Will identify patients with
5   special health care needs and refer them
6   for appropriate treatment planning,
7   correct?  You did not do that for Mr.
8   Patterson, though, did you?
9        A    I did not know he was diabetic.
10        Q    And I did not do anything to
11   identify it, did you?
12        A    No, was it -- I'm sorry?
13        Q    You did nothing to identify him as
14   being diabetic?
15        A    No, I didn't check his sugar, if
16   that's what you're asking.
17        Q    I mean, you didn't even ask him?
18        A    I didn't -- that wasn't -- that's
19   part -- that's part of the screening intake
20   when they come in.  Gilley asked him.  If
21   Gilley would have told me, hey, medical,
22   before you go upstairs --
23        Q    But, ma'am, where does it say here
24   --
25        A    -- he's diabetic.

1    Q    -- that that's Gilley's
2   responsibility?
3    A    They always tell us what's going
4   on.
5    Q    That's not what I'm asking you.
6   Where does it say in here that it's Gilley
7   responsibility to do that for you?
8    A    It doesn't say Gilley needs to tell
9   me.
10    Q    It says it's your job to find out,
11   right?
12    A    And I asked him, are you on
13   anything, and he said no.
14    Q    Ma'am, it's your job to find out if
15   a patient or an arrestee, okay, has a
16   special need, including diabetes?
17    A    Right.  But if I had been trained
18   on it, then I would have probably or almost
19   likely would ask him if he's diabetic.
20    Q    But you hadn't been trained to do
21   that?
22    A    Right, I told you that previously.
23    Q    No, you told me that you had been
24   trained to do any kind of vital signs?
25    A    Right.

1     Q    Who told that?

2     A    Who told me what?

3     Q    What you just testified to?   How

4  did you have that information?

5     A    On these things.   These -- from the

6  video and the deposition -- these papers.

7     Q    You're just gathering information

8  that you've skimmed over and you're kind of

9  regurgitating it --

10     A    Yeah.

11     Q    -- during your deposition?

12     A    I mean, I wasn't told any of this

13  information.

14     Q    Okay.

15     A    It's been four years.

16     Q    You did not see this giant puddle

17  --

18     A    No.

19     Q    -- of green vomit?

20     A    No.

21     Q    Correct?

22     A    Correct.

23     Q    Even though it's your testimony now

24  that you went down and looked into

25  Mr. Patterson's cell?

1   A   When he was in 114.

2   Q   So you never checked on him when he

3   was in this --

4   A   113.

5   Q   You never checked on him in 113?

6   A   No.

7   Q   And no one ever told that you he

8   had been repeatedly vomiting?

9   A   No.

10   Q   If you had been told that, what

11   would you have done?

12   A   Called Ellen.

13   Q   Okay.  And who do you blame for not

14   letting you know about Mr. Patterson's

15   condition in 113?

16   A   I can't blame anyone, but I was

17   never notified.

18   Q   What do you mean you can't blame

19   anyone?  Who would have been the -- who

20   would you have expected to tell you?

21   A   Main control.

22   Q   Okay.  And they did not?

23   A   Correct.  Or the CO's.  They're

24   supposed to do cell checks every hour.

25   They would have noticed a big puddle of

1   know he was an inmate --

2      Q   Did you know anything about him?

3      A   No.

4      Q   Did you take any steps to find

5   anything out about him?

6      A   No, not at the current time.

7      Q   Not at any time, did you?

8      A   What do you mean?

9      Q   At any time that Mr. Patterson was

10  housed in the Muskogee County Jail, did you

11  take any steps to ascertain any information

12  about him?

13     A   No, he was sent out.

14     Q   When is the next time that you

15  actually had a visible observation of

16  Mr. Patterson after he was booked?

17     A   I don't remember exactly.

18     Q   Well, why don't you go with your

19  best what you generally remember?

20     A   It was when he was in 114, and so

21  it would have been the Sunday evening

22  before I went home.  I went to main control

23  and asked Tonia to pull him up on camera.

24  This is after they had moved him and looked

25  at him and looked in and he was in 114 and

1   he was moving.

2       Q    And is that all you were to check

3   for to see if he was moving?

4       A    And breathing yeah, alive.

5       Q    Moving, breathing and alive?

6       A    Correct.

7       Q    That was the extent of how you had

8   been trained to check on Mr. Patterson?

9                MR. ARTUS:   Object to the form.

10               THE WITNESS:   I wasn't trained

11  but that's what I did.

12      Q    (By Mr. Smolen)   Okay.  And if he

13  wasn't breathing, what did you understand

14  your response to be?

15      A    Well, I would -- would start CPR,

16  and they would have called is 911.  There

17  are steps to take.

18      Q    When were you told that

19  Mr. Patterson had not been moving and that

20  he had been laying in the same position?

21      A    He never stopped moving that I was

22  aware of.  Nobody told me.

23      Q    You said the last time -- is that

24  you asked -- you asked master control to

25  look in on him again when he was in 114; is

1   that right?

2       A    Uh-huh.

3       Q    Did you -- is that a yes?

4       A    Yeah.

5       Q    Okay.  Did you ever, yourself,

6   visualize Mr. Patterson?

7       A    Did I see him on the screen, yes.

8       Q    Did you ever go check on him in 114

9   in the cell?

10      A    No, I can't go back there without

11  an officer.

12      Q    Did you ever take an officer and go

13  back there?

14      A    No.

15      Q    What time does your shift end,

16  ma'am?

17      A    7:00.

18      Q    And you said you had master control

19  pull him up right before you left?

20      A    Yeah, about 10, 15 minutes maybe

21  before I left.

22      Q    And what did Tonia tell you?

23      A    The same thing I just told you.

24  That he was moving around, he was still

25  laying in the floor, that he was still

1   naked, and that's it.
2                   (Video playing)
3     Q   Okay.  I'm showing you a video from
4   Cell 114 now at 5:08 p.m.  Is this what you
5   recall seeing when you looked at the video
6   or was it different than this?
7     A   I -- I mean, I don't recall but,
8   yeah.  I mean, it was 2018.  I don't
9   remember exactly how he was.
10    Q   So roughly 12 hours Mr. Patterson
11  has been lying naked in a cell kind of
12  writhing around on the floor, right?
13              MR. ARTUS:  Object to the form.
14              THE WITNESS:  Not in the same
15  cell.  He was in 113.  Then he moved to 114
16  so, no.
17    Q   (By Mr. Smolen)  He continued to
18  have the same behavior in both cells,
19  correct?
20    A   Correct.
21    Q   Okay.  And that behavior is
22  consistent with what we're watching on the
23  video around 5:09 p.m. on the 17th,
24  correct?
25    A   Uh-huh.

1   Q   Yes?

2   A   Yeah.

3   Q   And you had no concern by what you

4   were observing?

5   A   I mean, they usually do -- I mean,

6   they -- I mean, he was hot.  He was naked.

7   He was on drugs.  I mean, I don't know how

8   -- what he does.  He's got clothes right

9   there.  The officer should have helped him

10   put it on.

11   Q   But you don't think Mr. Patterson

12   looks like he's in any kind of distress?

13   A   No.

14   Q   Do you believe Mr. Patterson was

15   treated appropriately at the Muskogee

16   County Jail?

17   A   No.

18   Q   And why do you say that?  What --

19   what is your basis for saying that?

20   A   Well, after I had left previous,

21   when they -- the officers put him in 113,

22   first of all, they should have at least

23   tried to put the clothes on him.  But I

24   don't know.  I wasn't there.  I don't know

25   what happened.

1    Q  Officer Gilley -- did he say

2  anything to you during the intake process

3  that could explain why he's acting this

4  way?  Did maybe Gilley goes, well, he did

5  mention he's diabetic and insulin

6  dependent, and then you say, oh, well,

7  maybe we should check his blood sugar, like

8  that?

9    A  I didn't talk to Officer Gilley.  I

10  talked to Officer Reynolds that was there

11  with him.

12    Q  You didn't talk to the intake

13  officer?

14    A  Right.  But I didn't know that they

15  -- how they do their medical intake at the

16  time.  I wasn't trained.

17    Q  Ma'am, it doesn't take a whole lot

18  of training to ask a person, hey, did this

19  guy say anything on his intake that might

20  lead you to understand what's going on with

21  him?

22    A  I didn't know to ask that.

23    Q  Okay.  And who do you think is

24  responsible for not making sure that you

25  knew that you could ask the intake

1    Q    But you think it's safe to have
2  what you've described yourself as the
3  bottom of the barrel?
4    A    Uh-huh.
5    Q    Okay.  That's how you described
6  yourself, correct?
7    A    I don't have an LPN.
8    Q    You think it's safe to have the
9  bottom of the barrel there on weekends for
10  inmates who come in that have serious
11  medical needs?
12    A    Well, if they come in with serious
13  medical needs, then -- I mean, as now I
14  know, I would call.
15    Q    I'm talking about then when
16  Mr. Patterson died?
17    A    Oh, no.
18    Q    Do you still think that's safe?
19    A    No.
20    Q    Okay.  It was unsafe the way that
21  it was set up at the time Mr. Patterson was
22  admitted into the jail, correct?
23    A    Correct.
24    Q    What do you recall about Monday?
25  Did you come to work on Monday?

1    A    Putting the blanket under his head.

2    Q    Okay.

3    A    So it was at least not rolling

4  around on concrete.  I don't know who's

5  there at the door.

6    Q    Is this when you believe Ellen

7  stepped out and called Dr. Smith?

8    A    No.  I don't -- no, she was in

9  there first and then she stepped out, I

10  believe.  Yeah, because she comes in first.

11    Q    Okay.  But this is the encounter

12  where you believe she called Dr. Smith?

13    A    Yeah, she did -- yeah, she checked

14  on him first and then she steps out.

15    Q    And calls him?

16    A    Yeah.  And then I think Kelsey

17  comes in shortly after or she's standing at

18  the door.

19    Q    What did she hand you?

20    A    The oxygen thing.

21    Q    Pulse ox?

22    A    Yeah.

23    Q    And what do you do with it?

24    A    I put it on his finger.

25    Q    Okay.  And what did it show you?

1    A    It didn't show anything because his
2  hands were too cold, so I had to take it
3  off -- well, in the video, I take it off
4  and then I'm trying to rub his hands to get
5  him to warm up.
6    Q    Because he's so cold to the touch
7  by this point?
8    A    Yeah.  Usually, it's colder in
9  detox, but he -- I mean, he doesn't have
10 any clothes on.
11   Q    Right.  But you said that the pulse
12 oximeter did not work because he was too
13 cold?
14   A    Yeah.  It usually won't read your
15 oxygen level if you're too cold.
16   Q    How do you know -- what is your
17 basis for that information?
18   A    It happens all the time.  If you
19 don't have kind of a warm fingertip, it
20 can't read it.  You've got to keep trying
21 and trying.  You've got to rub the hand,
22 warm it up.
23   Q    His pulse ox was so low that the
24 machine wasn't reading it, correct?
25   A    No, it was his hands -- they were

1   too cold.

2      Q    Did you ever get a reading?

3      A    Did I ever get a reading, no.

4      Q    Because you could never get his

5   body warm enough to get a reading?

6      A    His body?

7      Q    Yeah.

8      A    No.

9      Q    It was important for you to get a

10  pulse ox, yes?

11     A    It's important for all vitals, yes.

12     Q    Okay.  But you didn't stick around

13  long enough to actually get them?

14     A    No.  Ellen takes over when she

15  comes down.

16     Q    And neither of you stood around

17  long enough to get his vitals on the pulse

18  ox?

19     A    Kelsey was with her.  She's also a

20  --

21     Q    Right.  All three of you failed to

22  do that?

23     A    All three failed what?

24     Q    To get his pulse ox reading?

25     A    If we can't get it, we can't get

1   on him, didn't you?
2       A    I did.
3       Q    And on Sunday, did you ever notice
4   -- to you, did you ever see anything that
5   you were like, hey, I need to call Nurse
6   Ellen or I need to call 911?
7       A    Not on Sunday, no.
8       Q    And you have diabetes, right?
9       A    Correct.
10      Q    And you've had it for -- since
11  before Mr. Patterson was put in the jail,
12  right?
13      A    Oh, yeah.
14      Q    Now Nurse Ellen has testified that
15  you -- that she trained you to check those
16  intake questions when inmates would come
17  in; that you -- that one of your jobs was
18  to check that; do you disagree with that?
19      A    At the time or now?
20      Q    At the time?
21      A    At the time, yeah, I do.
22      Q    Okay.  Is it possible that you just
23  don't recall being trained on that?
24              MR. SMOLEN:  Objection,
25  leading.