IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

FLOYD PATTERSON, JR.,          )
as Special Administrator)
of the Estate of FLOYD  )
PATTERSON, III,         )
deceased,               )
          Plaintiff,    )
                        )
vs.                     )Case 20-CV-040-RAW
                        )
TERRY FREEMAN, in his   )
official capacity,      )
et al,.                 )
          Defendants.   )

DEPOSITION OF
TONIA WATSON

DATE:  SEPTEMBER 9, 2021

REPORTER:  MARISA SPALDING, CSR, RPR

Spalding Reporting Service, Inc.
1611 South Utica Avenue, Box 153
Tulsa, Oklahoma 74104
(918) 284-2017

PLAINTIFF'S
EXHIBIT
tabbies 15

1  close that gate.  And then you open our
2  garage door, and you close it.  And then
3  you open and close the back gate.  And
4  you're also taking calls from the inmates
5  that they ask -- they want to know when
6  their next court date is or their CIN
7  number is not working.
8     Q   What is your -- do you have a
9  written job description?
10    A   Main control.
11    Q   As -- as -- right.  In main
12 control, do you have a written job
13 description that tells you what your
14 responsibilities are?
15    A   Yeah, it's to take care of the
16 inmates, to watch the cameras, to -- it --
17 it requires me to feed if they need me to
18 feed.
19    Q   Okay.
20    A   If they need me to --
21    Q   And what -- let me just break that
22 down.  You watch all of the cameras in the
23 facility, collect?
24    A   Downstairs.  If I'm on main
25 control, it's downstairs.

1     Q   Okay.

2     A   Of the inmates.

3     Q   And the sheriff also had access to

4 the same video cameras in his office,

5 right?

6     A   Right.

7     Q   Okay.  And the undersheriff as

8 well?

9     A   I think so.

10     Q   And you were required to watch and

11 monitor the cameras during your shift,

12 correct?

13     A   Yes, sir, uh-huh.

14     Q   And you would be asked to open

15 doors so that people could move about the

16 facility, correct?

17     A   Uh-huh.

18     Q   Yes?

19     A   Yes.

20     Q   You would have to listen to inmates

21 that wanted to know more specifics about

22 their court dates.  They had access to call

23 you in main control?

24     A   Yeah, there's a -- I have a little

25 speaker and a button here, and sometimes

49

1  not seen this document before?

2      A    No, I have not.

3      Q    All right.  Take a minute to read

4  to yourself the bottom paragraph, if you

5  would, please.

6              MR. BEN KELLER:  Can you see

7  okay?

8              THE WITNESS:  Yes, I can see.

9  Okay.

10     Q    (By Mr. Smolen)  Have you had an

11  opportunity to that document?

12     A    Yes, I read it.

13     Q    Now you were working --

14             MS. DARK:  Hey, Dan, I just

15  want to make sure you're on DDR 37, 3?

16             MR. SMOLEN:  Yes, that's right.

17             MS. DARK:  Okay.

18             MR. SMOLEN:  The bottom

19  paragraph, Jessica.

20             MS. DARK:  Okay, thanks.

21     Q    (By Mr. Smolen)  You were working

22  on June 17th of 2018; is that right?

23     A    Yes, that's correct.

24     Q    And your shift started about 7:00

25  a.m., correct?

1    A   Yes.

2    Q   So you had just come on shift

3 around the time Mr. Patterson was booked

4 into the facility, correct?

5    A   Yes.

6    Q   Do you recall watching the booking

7 process of Mr. Patterson?

8    A   Off and on, because I was also

9 having to watch 70 something other inmates.

10    Q   Were you advised as to why

11 Mr. Patterson was placed in Cell 113?

12    A   No, I wasn't.

13    Q   You were not?

14    A   I was not.  Not that I -- well, not

15 that I recall.

16    Q   I want to go to the video from when

17 he's placed in the cell.

18            (Video playing)

19    Q   Do you recognize the two

20 individuals -- the two officers here that

21 are in the scene?

22    A   The one by the door in the glasses

23 is Jonathan Cobb.  And the other one -- I

24 couldn't see his face.

25           MS. DARK:  I can't hear

1    anything anymore.

2         MR. ARTUS:  Okay.  You can turn

3    it back the other way.

4         MR. ARTUS:  Sorry.

5         MS. DARK:  Thank you.  Thanks

6    for trying.

7    Q    (By Mr. Smolen)  Is it common for

8    inmates to be placed in the cell unclothed?

9    A    Does he not have something behind

10   his head like a blanket?

11   Q    Ma'am, is it common for inmates to

12   be placed in this cell unclothed?

13   A    No, no, never.

14   Q    Okay.

15   A    They bring a jumpsuit.  They bring

16   -- now we can't make them get dressed but

17   --

18   Q    How often --

19   A    -- they bring them a jumpsuit.

20   Q    How often are inmates held in a

21   cell that refuse to put on clothing?  How

22   frequent is that?

23   A    Not very frequently.

24   Q    Okay.  So it's an unusual

25   occurrence, agreed?

1    A    Yeah.
2    Q    Okay.  And you're noticing that --
3 you're watching that in real time as it's
4 happening, correct?
5    A    Right.
6    Q    Did you document that anywhere?
7    A    No.
8    Q    Did you talk to any supervisors
9 about why this individual is in a cell
10 unclothed?
11    A    No.
12    Q    Did you inquire of anybody as to
13 what the condition of the inmate was in
14 prior to him being placed in the cell?
15    A    That, I don't remember because a
16 lot of times I do ask why is this person
17 here and they will tell me.
18    Q    Well, wouldn't that be it important
19 to know why someone is being put into a
20 medical cell or a detox cell?
21    A    It would be.  But if they're busy
22 or they have two more inmates to -- what do
23 you call it -- triage the questions -- I'm
24 not saying in this case, but in some cases
25 there's more than one inmate that's brought

1   A   Yes, sir.

2   Q   Okay.

3           (Video playing)

4   Q   Here you were able -- you would

5   have been able to watch Mr. Patterson take

6   a drink of the water of the jug that was

7   provided to him; is that right?

8   A   Uh-huh.

9   Q   Yes?

10  A   Yes.

11  Q   Ma'am, when you saw Mr. Patterson

12  repeatedly vomit green bile?

13  A   I didn't him throw it -- throw it

14  up.

15  Q   Ma'am, you were watching this

16  continuously, correct?

17  A   I'm watching 78 inmates

18  continuously and opening doors.

19  Q   Okay.

20  A   Well, here's --

21  Q   No.

22  A   Okay.

23  Q   Were the other 78 inmates doing

24  what Mr. Patterson was doing?

25  A   If I'm watching someone else or

1    taking a call, it can happen that quick --

2        Q    Okay.

3        A    -- and you miss something.

4        Q    So you don't think that the jail is

5    adequately staffed with people in the main

6    control?  You think that you needed more

7    people?

8        A    No, you're trying to put words in

9    my mouth.  I never said that.

10       Q    But you're saying you had all these

11   other obligations?

12       A    I had 78 inmates that day, and I

13   told you had to open sally ports.

14       Q    It sounds like you're too busy to

15   watch Mr. Patterson?

16       A    No, I'm watching 78 people and I'm

17   one person, so I'm doing the best I can.

18       Q    Okay.  Were -- were the other 78

19   inmates puking green bile in a medical

20   cell?

21       A    No.

22            MR. ARTUS:  Object to the form.

23       Q    (By Mr. Smolen)  Okay.  They

24   weren't, right?

25       A    Right.

1    Q    Okay.  And, certainly, you advised

2    somebody about what was going on?

3    A    If I had seen it, I sure would

4    have.

5    Q    Okay.  Well, we know you were

6    required to monitor.  That was a primary

7    job that you had, right?

8    A    To monitor 78 inmates, yes.

9    Q    Including Mr. Patterson?

10   A    Including him.  He makes 78.

11   Q    And we see Mr. Patterson repeatedly

12   vomiting green bile, correct?

13            MR. ARTUS:  Object to the form.

14            THE WITNESS:  If I was opening

15   doors, watching a car go in, no.  If I'm

16   watching maintenance go in three doors, it

17   just -- it could happen that quick.

18   Q    (By Mr. Smolen)  We just watched it

19   together?

20   A    Yes, and he vomited very quick.  If

21   I'm watching a policeman go in three doors

22   and letting them in or maintenance come in

23   three doors, it can happen that quick, or

24   answering a call, pushing a button, can I

25   help you, and you look back and you don't

1  oxygen?

2      A    They didn't tell me that.

3      Q    Okay.  You don't call anyone until

4  right before he's pronounced dead, correct?

5      A    No.

6      Q    Well, when was Mr. Patterson

7  pronounced dead?

8      A    I think it was at the hospital.

9      Q    How do you know that?

10     A    I was told.

11     Q    Who told you?

12     A    Somebody told me.  I don't know.

13  It was three, four years ago, but somebody

14  told me.

15     Q    Let's go back to this video.  Let's

16  keep watching it for a minute.

17              (Video playing)

18     Q    Missed -- you missed that one, too,

19  it sounds like?  I mean, at this point,

20  he's puked four times and you didn't see

21  any of them; is that your testimony to the

22  jury?

23     A    Yes, it is.

24     Q    And you didn't notice that large

25  green puddle of vomit there on the floor?

1    A    No, I didn't.

2    Q    So you're telling the jury -- just

3  so I make sure we're clear -- you watched

4  this video for the next ten hours and never

5  noticed the -- the green vomit substance on

6  the floor?

7    A    No, I didn't.  And my screen is

8  this big compared to yours.  This big for

9  78 inmates.

10    Q    You think that the screen size was

11  inadequate --

12    A    No.

13    Q    -- for you to properly do your job?

14    A    No, I do not.

15    Q    Okay.  Did you ever raise the issue

16  of the screen size with the sheriff's

17  office prior to Mr. Patterson's death?

18    A    No.

19    Q    Okay.  You don't dispute if you

20  were watching the screen, you would have

21  seen him vomit, correct?

22    A    Correct.

23    Q    It's now been an hour and 15

24  minutes since Mr. Patterson was put into

25  that cell.  Did you see anyone do a cell

Q   You said, I was still concerned about Mr. Patterson, and Valerie Vickrey came over to look at the cameras.  So why were you concerned around 11:00 a.m. on the -- with what you observed in Cell 114 if you hadn't been that concerned about it beforehand?

A   I don't know.

Q   You can't tell a jury why?

A   No, I can't.

Q   Okay.  You have no recollection of why all of a sudden you became concerned?

A   No, not three years ago.  I could have been on break.  I could have been doing anything, you know.

Q   After Mr. Gilley on him multiple times, your note says you were still concerned, correct?

A   Right.

Q   Why?  If this is normal behavior, why were you still concerned?

A   I don't know.  I just had a feeling.  I just had a feeling something is not right.

Q   It was your instincts that told

1   kept telling me, you know -- but it's even
2   on camera, I'm sure, on the audio, that --
3   well, there's two things that happened.
4   Something just kept gnawing on me.  Maybe
5   it was I know he's sick.  But like I said,
6   I don't know much about drugs, but I just
7   had this feeling that one of these days
8   somebody is going to OD in our jail slowly.
9           MR. FRAZIER:  Yeah.
10          MS. WATSON:  Like their kidneys
11  are going to shut down.  And -- ooh.  And I
12  kept saying, you know, they've -- I forget
13  who said he's fine.  But, you know, they
14  had seen his head move, but these legs
15  stayed like this forever.
16          MR. FRAZIER:  Uh-huh.
17          MS. WATSON:  And I thought, you
18  know, that's just not natural, and so we
19  called for medical.  Ellen came back in
20  main control, went and washed her hands and
21  came out -- came up to me and says, well --
22  and this should be on camera, too -- he's
23  showing resistance.
24          MR. FRAZIER:  Right.
25          MS. WATSON:  And I was like

1  what do you mean?  She says, well, if I

2  push on him, he pushes back.  So he's

3  showing resistance.  And I said, yeah, but

4  -- something about his legs not moving.

5  I'm concerned.

6           MR. FRAZIER:  Right.

7           MS. WATSON:  And then I kept --

8  I really blowed up the screen at this time

9  and started watching him.  And I told Val

10  -- I said, hey, Val come here.  I said,

11  something just ain't right.  I said, he's

12  been in this position too long, even though

13  his head moved.  So this time she called

14  medical, and that's about when they went

15  down there and -- you know, I think he was

16  out like 11:50 something so --

17           MR. FRAZIER:  Yeah.

18           MS. WATSON:  -- from 7:00 to

19  11:50.

20           MR. FRAZIER:  Okay.  So...

21           MS. WATSON:  That's

22  four-and-a-half, five hours.

23           MR. FRAZIER:  Okay.  You've got

24  another one here at 10:20.  So they were --

25  they were in here?

1   Q   -- he was released or at least his

2   --

3   A   No.

4   Q   -- his death was called?

5   A   You're putting words in my mouth.

6   There's no way I would feel that way.

7   Q   You understand at the time that

8   they checked on him, they couldn't even get

9   a oxygen level?  The time that they checked

10  on him in the jail cell that you were

11  monitoring, did you know that he was cold

12  to the touch and that they couldn't even

13  get an oxygen reading?

14  A   That's when I was calling every 15,

15  20 minutes.

16  Q   Calling who every 15, 20 minutes?

17  A   To go back there and check on him.

18  Q   Who?

19  A   It was Ellen, I think.  Wait.  It

20  was Rachael, Kelcey.  I can't remember who

21  else.

22  Q   And would they not do -- would they

23  not go check on him?

24  A   I think they were back there.  I

25  mean, I know they were back there.

1    Somebody was there.

2        Q    And did they tell you, oh, we just

3    checked his oxygen levels and --

4        A    Oh --

5        Q    -- we can even read it?

6        A    -- that, no, no, they didn't tell

7    me that.

8        Q    Did they tell you that he was

9    combative and that he was pushing back?

10       A    No, they didn't say he was

11   combative.

12       Q    Or he was resisting?

13       A    No.

14       Q    Okay.  Did they ever tell you why

15   they were unable to get his vitals?

16       A    No, sir.

17       Q    It sounds like there was a period

18   of time that the jail staff were asking you

19   to document cell checks that were not

20   happening.  Was that going on?

21       A    It might have been --

22       Q    Okay.

23       A    -- at that time.

24       Q    For how long did that go on for?

25   Can you give me your best estimate?

1   Frazier and watched the video?

2          MR. ARTUS:   Object to the form.

3      Q    (By Mr. Smolen)   Do you think

4   that's a possibility?

5      A    No.   Probably workers.   Because you

6   find out more stuff from workers than you

7   do from --

8      Q    Okay.

9      A    -- anyone else.

10     Q    You think you got it from some --

11  one of your coworkers?

12     A    Correct.

13     Q    Okay.   How did that make you feel

14  when you found out that he had died as a

15  result of complications related to his

16  diabetes?

17     A    Well, awful, you know.   I still

18  feel awful.

19     Q    Did you ever have an opportunity to

20  train with any medical staff about what you

21  should be looking for as a jailer?

22     A    (Moving head side to side)

23     Q    I can't hear you.

24     A    No, sir.

25     Q    Did anyone at all take any kind of

1   steps like that to make sure you could at

2   least understand basic medical things to

3   observe?

4       A    I don't think so.

5       Q    That's consistent with what other

6   jailers have testified to.  I just want to

7   make sure that your experience wasn't

8   different?

9               MR. ARTUS:  Object to the form.

10      Q    (By Mr. Smolen)  It sounds like

11  it's pretty consistent with the other

12  people's testimony that, as far as it

13  pertained to identifying any kind of

14  emergent medical conditions, there was no

15  training on that issue?

16      A    Not that I recall, no.

17      Q    Okay.  Do you think some -- maybe

18  -- maybe you should have done something

19  better over that 48-hour period, but -- but

20  do you believe that other employees that

21  worked at the Muskogee County Sheriff's

22  Office should have handled the situation

23  differently?

24              MR. ARTUS:  Object to the form.

25      Q    (By Mr. Smolen) I've got to get a