```
      IN THE UNITED STATES DISTRICT COURT FOR THE
              EASTERN DISTRICT OF OKLAHOMA

JAMES D. BUCHANAN,
        Plaintiff,

vs.                              No. 18-CV-171-RAW

TURN KEY HEALTH CLINICS,
LLC, et al,
        Defendant.




                      DEPOSITION OF
                       FLINT JUNOD








DATE:  AUGUST 2, 2019

REPORTER:   MARISA SPALDING, CSR, RPR





             Spalding Reporting Service, Inc.
              1611 South Utica Avenue, Box 153
                  Tulsa, Oklahoma 74104
                      (918) 284-2017
```

PLAINTIFF'S EXHIBIT 30

1  MR. YOUNG: And for the record, Bob,
2 some of them will overlap and that's because he
3 took them obviously on different specialties.
4 Sometimes Flint will be speaking generally and
5 Dr. Cooper will be speaking specifically and
6 vice versa, and they know their roles in which
7 ones as we go through those.
8  MR. BLAKEMORE: Okay.
9  Q  (By Mr. Blakemore) Are you currently
10 employed?
11  A  Yes, sir.
12  Q  And how are you employed?
13  A  By Turn Key Health Clinics.
14  Q  And what is your position with Turn Key?
15  A  I am the CEO.
16  Q  And for the record what is Turn Key
17 Health Clinics?
18  A  Turn Key Health Clinics is a provider of
19 correctional health care.
20  Q  And how long have you served in the
21 capacity of CEO?
22  A  I believe since the summertime of 2016.
23  Q  How were you employed prior to summer of
24 2016 when you came over with Turn Key?
25  A  I was COO.

1  Q   Okay. How did it?
2  A   To a certain extent, I took a lot more
3  active role in -- in reviewing invoices and --
4  and balance sheets that had previously been
5  mostly reviewed by our finance guy.
6  Q   Did your duties and responsibilities
7  change in any other way when you became CEO?
8  A   I -- I mean, guess I'm more involved
9  with -- with a wider scope of the operation as a
10 typical CEO.
11              (Plaintiff's Exhibit No. 18
12              marked for identification)
13 Q   I'll hand you what we've marked as
14 Exhibit 18. Can you identify Exhibit 18 for the
15 record?
16 A   This appears to be the contract between
17 Muskogee County and Turn Key Health Clinics.
18 Q   And do you know for what -- what time
19 period?
20 A   It is dated June of 2016.
21 Q   Okay. If you look at -- there's these
22 little -- well, it's actually just Page 10 of
23 the contract is what I'm looking at.
24 A   Okay.
25 Q   And I'm looking at Roman Numeral --

 1  Roman Numeral IV; do you see that?
 2      A   Yes, sir.
 3      Q   And so what was -- what was the term of
 4  this contract?
 5      A   July 1, 2016 through -- it -- it appears
 6  to have a typo through June 30, 2017, a 12-month
 7  period.  Oh, I'm sorry, that is not a typo, I
 8  misread it.
 9      Q   Okay.  So that's correct, right?
10      A   Correct, yeah, July 1, 2016 through June
11  30, 2017.
12      Q   All right.  If you look at -- if you
13  turn over to Page 13.
14      A   Yes, sir.
15      Q   Is that your signature?
16      A   Yes, sir.
17      Q   So you signed the contract with the --
18  with Muskogee County on behalf of Turn Key; is
19  that right?
20      A   Yes, sir.
21      Q   Okay.  Did you -- did you have any role
22  in negotiating this contract with the Board of
23  County Commissioners?
24      A   Yes, sir, but my role was primarily with
25  sheriff's office personnel, not the Board of

```
 1  meeting and there were attendees at other
 2  meetings, but I don't know which was which.
 3       Q    Was anyone else from Turn Key meeting
 4  with Mr. Bickel and other representatives of the
 5  sheriff's office at this time?
 6       A    During our initial discussion, I
 7  probably had nurse -- I don't know if it was the
 8  first encounter or not, but --
 9       Q    I'm just talking generally --
10       A    -- okay.
11       Q    -- these first meetings before the
12  contract?
13       A    Yeah, maybe Ms. Bilyeu, who was our
14  regional nurse, and I believe John Echols went
15  to one of them, but I don't know which one.
16       Q    All right.  And you said that Mr. Bickel
17  was talking to you about potentially having a
18  private contractor.  Do you know whether the
19  jail had ever had a private medical provider
20  before?
21       A    I don't -- no, I don't know.  They
22  didn't have one at the time.
23       Q    Did -- did Mr. Bickel or anyone else
24  from the sheriff's office provide you with any
25  specifics as to what they were -- what they were
```

1  wanting in a medical contractor?
2     A   They -- they were operating with medical
3  assistance primarily and a nurse practitioner,
4  and they wanted a company who could provide
5  nursing hours, in addition to their MA's, and
6  basically someone who would oversee the medical
7  operation so it was one less day-to-day
8  responsibility for them.
9     Q   Who was the -- who was the sheriff at
10 that time?
11    A   Charles Pearson.
12    Q   Did you have any meetings with Pearson
13 in these initial phases of the relationship?
14    A   I don't remember any, sir.  I -- I think
15 before the contract started, I met him once but
16 not my initial -- my initial conversations were
17 primarily with Mr. Bickel.
18    Q   So at some point this progresses into
19 you -- they're asking for a proposal, is that --
20    A   Yes.
21           MR. YOUNG:  Object to the form.
22    Q   (By Mr. Blakemore)  Is that -- is that
23 how that happened?
24           MR. YOUNG:  You can answer it.
25           THE WITNESS:  Yes, sir.

1   Q   (By Mr. Blakemore)  And do you know
2   whether there were any other providers who bid
3   on the -- the contract at the Muskogee County
4   Jail?
5   A   Yes, I believe -- I believe there were
6   two others that Loyd told me.  I think Southern
7   Health had provided him a proposal and possibly
8   Advanced Correctional.  I don't know when or how
9   many months prior --
10  Q   Okay.
11  A   -- it was.
12  Q   Do you recall when approximately you
13  provided the -- the proposal?
14  A   I think we initially provided it in the
15  early part of 2015 and through, you know, many
16  discussions with them it probably adjusted up
17  through, I think, December of 20 -- 2015.  And
18  then the contract started early part of 2016.
19  Q   Okay.  So was there a -- this Exhibit 18
20  is, as you testified to, it's a contract with a
21  term from July 1st, 2016 through June 30th,
22  2017, right?
23           MR. YOUNG:  Go back to Page 10.
24           THE WITNESS:  Yeah.  Yes, sir.
25  Q   (By Mr. Blakemore)  So was there a

```
 1   contract prior to this with Muskogee County?
 2        A    Yes, sir.
 3        Q    And do you have a recollection as to
 4   when that contract became effective?
 5        A    I believe it was March of 2016.
 6        Q    So is Exhibit 18, is that the -- is that
 7   the second contract or was there another one?
 8        A    I believe so.
 9        Q    There was --
10        A    I believe we had like a three or -- like
11   a three month.
12        Q    Okay.
13        A    Because we started mid budget cycle.
14        Q    Okay.  You start out in March?
15        A    Yeah.
16        Q    20 --
17        A    I believe it was March.
18        Q    All right.  So then you might -- you
19   believe that you had like a three-month contract
20   in between that first contract, Exhibit 18?
21        A    Yes, sir.
22        Q    Did you -- well, let me ask you this
23   first.  Do you recall any significant changes or
24   amendments between the initial contract and
25   Exhibit 18?
```

```
 1      Q    All right.  Look at -- I'm now at Page 4
 2   and I'm looking at the -- it starts on the
 3   bottom of the page there.  It's Section 1.14,
 4   medical and nursing services provided; do you
 5   see that?
 6      A    Yes, sir.
 7      Q    All right.  And now I am looking at the
 8   next page, Page 5, which is Subpart 2; do you
 9   see that?
10      A    Yes, sir.
11      Q    And it states that the contractor, which
12   is Turn Key, right?
13      A    Yes, sir.
14      Q    Shall provide medical unit coverage
15   seven days a week.  Well, first of all, did you
16   have an understanding that there was a medical
17   unit within the Muskogee County Jail?
18              MR. YOUNG:  Object to form.
19              THE WITNESS:  Can you define medical
20   unit?
21      Q    (By Mr. Blakemore)  I mean, it's your
22   con -- your contract.  What did you mean by
23   medical unit?
24      A    Oh, I'm sorry, I -- it's the office area
25   where the nurses work and there was an exam
```

1  area.
2      Q   Would you said -- so an office area
3  where the nurses work and exam area; is that
4  what you said?
5      A   It -- yes.
6      Q   I mean, would you -- I mean, you've been
7  working in correctional medicine for a while.
8  Would you describe that as an actual medical
9  unit?
10             MR. YOUNG:  Object to form.
11             THE WITNESS:  It's -- well, it would
12  be a medical area where we work.
13      Q   (By Mr. Blakemore)  Okay.  So is that
14  what you're referring to in the contract when
15  you say medical unit?
16             MR. YOUNG:  Object to form.
17             THE WITNESS:  Our nurses and
18  personnel would -- would work throughout the
19  facility, but the medical unit is where they
20  would be stationed out of.
21      Q   (By Mr. Blakemore)  Okay.  And that's
22  that office area?
23      A   Yes, sir.
24      Q   All right.  But you understand that some
25  jails, obviously bigger jails like you've worked

```
 1                MR. YOUNG:  Object to form.  You can
 2   answer.
 3                THE WITNESS:  We -- we're in
 4   compliance with 2A on Page 5.  If we had 168
 5   hours of combined time of RN, LPN, MA, CMA or
 6   EMT, that would be in compliance with the
 7   contract.
 8        Q    (By Mr. Blakemore)  Did you ever make
 9   any specific commitment -- contractual
10   commitment to Muskogee County to have R --
11   specifically RN coverage for any specific time
12   during a week?
13                MR. YOUNG:  Object to form.
14                THE WITNESS:  I think our contract
15   is pretty clear in what we told Muskogee County
16   we would do.  We would do a -- we would do 168
17   hours a week of medical personnel and it could
18   be composed of those qualifications.
19        Q    (By Mr. Blakemore)  Okay.  But I asked
20   you a specific question.  I asked you if you
21   ever made any contractual commitment to Muskogee
22   County to provide specifically RN coverage for a
23   specified number of hours per week?
24                MR. YOUNG:  Object to form.  You can
25   answer.
```

1    THE WITNESS: I believe this is the
2 only contract and I don't see that in here, so
3 it would not be a contractual obligation.
4    Q  (By Mr. Blakemore) Do you know -- do
5 you know whether there was any RN coverage at
6 the Muskogee County Jail?
7    A  I -- I don't know when everybody worked.
8 I'm sure there could have been at times. I know
9 the ARNP would be there, which is an RN so it --
10 I -- I don't know -- I don't know, you know, the
11 schedule today of every person who ever worked
12 at Muskogee County.
13    Q  Okay. Well, let me just ask you, do you
14 recall -- do you recall an RN ever working on
15 site at the Muskogee County Jail?
16    A  I know the -- Lela Goatley would have
17 been on site so she would meet that
18 classification.
19    Q  Okay. So Lela Goatley, she's a nurse
20 practitioner, right?
21    A  Advanced registered nurse practitioner.
22    Q  Okay. And --
23    A  As well as an RN, I believe.
24    Q  She didn't work full time at the -- at
25 the Muskogee County Jail, did she?

1    A    No, sir.
2    Q    How often was she at the Muskogee County
3  Jail?
4    A    I don't have time sheets in front of me
5  but I can tell you when I reviewed November
6  2016, we averaged -- I think we did eight
7  provider clinics that month from what I remember
8  reviewing, and that was composed of Dr. Cooper
9  and Lela Goatley.
10   Q    Let me ask it to you this way.  Are you
11 aware of any RN who worked at the Muskogee
12 County Jail on site full time?
13            MR. YOUNG:  Object to form.  Answer
14 if you can.
15            THE WITNESS:  I don't -- I don't
16 know of a full time RN that worked at Muskogee
17 County.
18   Q    (By Mr. Blakemore)  Was there a -- was
19 there ever a full-time physician who worked at
20 the Muskogee County Jail?
21            MR. YOUNG:  Object to form.  Do you
22 mean on call or in the building?
23            MR. BLAKEMORE:  I mean, actually
24 working there.
25            THE WITNESS:  We -- we had two full

```
 1      Q    Who was the general manager during the
 2  time frame of the -- this contract in 2016?
 3      A    I believe it was Nicole Cobb.  Excuse
 4  me, are we referring to the entire year or
 5  November?
 6      Q    Okay.  Well, let's talk about November
 7  first.
 8      A    Okay.
 9      Q    Who was the regional manager?
10      A    That would have been Nicole Cobb.
11      Q    And so when you say refuse, did Ms.
12  Cobb, did she actually go into the jail and
13  conduct like an audit type review of whether the
14  contract was being complied with?
15      A    She would go in and review the charts
16  that were patients in the facility.  She would
17  review probably logs.  She would review the
18  orderly -- if the unit was orderly, staffing
19  compliance.
20      Q    Would she -- would she actually talk to
21  any of the medical personnel at the jail?
22      A    Yes, sir.
23      Q    And you were about to say something
24  else.
25      A    No.
```

1    Q   All right.  Now did Ms. Cobb ever -- did
2  she ever write like a -- any type of report as
3  to her reviews that she conducted at the jail?
4    A   Most of our conversations were via
5  telephone, maybe an email now and then.
6    Q   Okay.  So this email, would it summarize
7  what she found as a result of her review at the
8  facility?
9    A   Generally, reports were based off of
10 areas of concern at the facility.
11   Q   Okay.  Do you recall what -- what any of
12 those areas of concern were at the -- at the
13 Muskogee County Jail?
14   A   Generally, the primary concern was
15 detention staffing levels.
16   Q   And what was the concern with respect to
17 detention staffing levels?
18   A   That the number of personnel was not
19 sufficient.
20   Q   Sufficient for what?
21   A   It would -- at times regional and us
22 waiting on patients to be seen or rescheduling a
23 clinic possibly if they didn't have enough
24 detention personnel to pull clinic.
25   Q   Okay.  Any other issues you recall with

1  Q   So that was kind of like -- that was an
2  ongoing issue --
3           MR. ARTUS:  Object to form.
4     Q   (By Mr. Blakemore)  -- at the jail?
5           MR. YOUNG:  Object to form.
6           THE WITNESS:  I don't know what
7  their staffing levels were because I obviously
8  wasn't working there every day, so it appeared
9  that when it would occur, we would address it
10 with security and resolve the issue for a period
11 of time.  And then it would --
12    Q   (By Mr. Blakemore)  Recur?
13    A   It happened on more than one occasion.
14    Q   Okay.  Let me -- let's skip ahead now to
15 Page 8 and I'm looking at -- it's Roman Numeral
16 II.  It says duties of agency; do you see that?
17    A   Yes, sir.
18    Q   Are you familiar with this provision
19 here, 2.1?
20    A   Yes, sir.
21    Q   All right.  So this is the -- the
22 provision on the reimbursement for services and
23 if you look down at the -- I'm looking at the
24 second paragraph under 2.1 and this specifically
25 says that the agreement was to cover services

1  for the agency with a facility average daily
2  population up to 350 inmates, correct?
3       A    Yes, sir.
4       Q    And did -- during the -- Turn Key's
5  period of providing medical services at the
6  jail, was there -- did you ever have or were you
7  ever aware of an issue with the facility being
8  overcapacity, over this 350 inmates?
9       A    In preparation for this deposition, I
10 did see populations and yes, they were -- there
11 were periods where they -- it was over 350.
12      Q    Now did you only become aware of that
13 through your preparation for the deposition?
14      A    At the time, I -- I don't remember what
15 the exact populations were.
16      Q    Okay. Did you ever -- did anyone like
17 Ms. Cobb or any of the medical personnel at the
18 -- at the jail ever complain to you or report to
19 you that the -- the jail was overcrowded?
20      A    I don't know if they ever said
21 overcrowded. It's -- they would have probably
22 told me the population was either high or above
23 350 at the time, yes.
24      Q    Okay. So you do recall hearing that?
25      A    Yeah, probably at some point, yes.

1   levels were appropriate, our staffing level was
2   -- was more than appropriate to meet the needs
3   of the facility.  And our viewpoint is -- was
4   that, you know, adding additional staff or -- or
5   asking for additional revenue was not necessary
6   because we had the staff.
7        Q    Okay.  But you did say that it was at
8   least --
9        A    It was an option.
10       Q    Yeah, right.  There was an option.  But
11  you also had at least the perception that the
12  understaffing of detention officers at the
13  facility was affecting the -- your ability to
14  provide care at the facility?
15            MR. ARTUS:  Object to the form.
16            MR. YOUNG:  Object to the form.
17       Q    (By Mr. Blakemore)  Is that right?
18       A    When security was -- when detention
19  staffing was an issue, it -- it would delay med
20  pass or delay clinic.
21       Q    Okay.  And did anybody -- or did you
22  ever have any understanding that at least part
23  of the -- the issue with the delays in med pass
24  or clinic was related to the overpopulation at
25  the jail?

1  says, it is mutually understood and agreed and
2  it is the intent of the parties hereto that an
3  independent contractor relationship be, and is
4  hereby established under the terms and
5  conditions of this contract.  Nothing in this
6  contract shall be construed to create an agency
7  relationship, an employee -- employer/employee
8  relationship, a joint venture relationship or
9  any other relationship allowing the agency to
10 exercise control or direction over the matter or
11 methods by which contractor, its employees,
12 agents or subcontractors perform hereunder.  Did
13 I read that correctly?
14      A    Yes, sir.
15      Q    And so Turn Key was not an agent of the
16 County; would you agree with that?
17           MR. BLAKEMORE:  Object to form.
18 Calls for --
19      Q    (By Mr. Artus)  Under the terms of this
20 contract?
21           MR. BLAKEMORE:  Object to form.
22 Calls for a legal conclusion.
23           THE WITNESS:  It -- the contract
24 reads that it is an independent contractor.
25           MR. ARTUS:  Thank you.  I think