IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

FLOYD PATTERSON, JR., as Special
Administrator of the Estate of FLOYD
PATTERSON, III, deceased,

        Plaintiff,

v.                                          Case No.  20-40-JWB

SHERIFF ANDY SIMMONS,
In his official capacity,
CITY OF MUSKOGEE, OKLAHOMA, and
CHRISTOPHER ROCHELL

        Defendants.

## MEMORANDUM AND ORDER

This matter is before the court on Defendants' motions for summary judgment.  (Docs. 75, 78, 81.)  The motion is fully briefed and ripe for decision.  (Docs. 75, 78, 81, 91, 92, 93, 100, 101, 102.)  The motions of Defendants Rochell and the City of Muskogee, Oklahoma are GRANTED, and the motion of Defendant Sheriff Andy Simmons is DENIED, for the reasons stated herein.

## I.    Procedural Background

Plaintiff Floyd Patterson Jr. ("Plaintiff") is the Special Administrator of the Estate of Floyd Patterson III ("Patterson").  Plaintiff is the father of Patterson.  Plaintiff brings this action under the Fourth and Fourteenth Amendments and raises a state negligence claim against City of Muskogee as well.  Patterson was arrested June 17, 2018.  The following day (June 18, 2018), he died from diabetic ketoacidosis.  Plaintiff has alleged claims against Christopher Rochell (a City of Muskogee Police Officer), the City of Muskogee, and the Sheriff of Muskogee County, Oklahoma.

1

Plaintiff raises a 42 U.S.C. § 1983 claim against Defendant Officer Rochell ("Rochell") for allegedly violating Patterson's Fourth Amendment Right—as applied via the Fourteenth Amendment—for wrongful arrest due to lack of probable cause. Plaintiff also raises a § 1983 claim against Rochell for violating his Fourteenth Amendment right to receive adequate medical care as a pretrial detainee.

Plaintiff raises three § 1983 claims against the City of Muskogee ("Muskogee") under the Fourteenth Amendment. The first two are (1) failure to train and supervise officers with regard to *recognizing* the signs and symptoms of serious medical conditions in arrestees, and (2) failure to train and supervise officers with regard to *protecting* arrestees from serious medical conditions. Plaintiff's third § 1983 claim against Muskogee is a Fourth Amendment violation for failure to properly train and supervise officers to determine probable cause exists to arrest individuals for public intoxication when individuals may also have medical conditions. Lastly, Plaintiff alleges a state law negligence claim against Muskogee on the grounds that Rochell failed to provide Plaintiff with adequate medical attention.

Plaintiff also raises a § 1983 claim against Sheriff Andy Simmons of Muskogee County, Oklahoma ("Sheriff Simmons") in his official capacity. Plaintiff alleges that Defendant Sheriff Simmons violated his Fourteenth Amendment rights by a denial of adequate medical care.

Plaintiff is seeking pecuniary, compensatory, punitive, and special damages for the alleged Fourteenth Amendment violations of denial of adequate medical care. Plaintiff seeks compensatory and special damages for the Fourth Amendment violation of wrongful arrest based upon the lack of probable cause. Lastly, Plaintiff also seeks damages in excess of $75,0000 for real and actual damages, mental and physical pain and suffering, emotional distress, and lost wages

under his negligence claim against Muskogee.  Defendants seek summary judgment for all claims Plaintiff has filed against them.

## II.    Factual Background

Patterson was a diabetic who, during the following events, had methamphetamine in his system.

The Muskogee Police Department received a call regarding Patterson, who was laying behind a vehicle in the street, at 7:50 a.m. on June 17, 2018.  (Doc. 78-1 at 2.)  Rochell was dispatched to the scene.  When Rochell arrived, Muskogee Police Officers Jaynes, Jones, and Kubiak were already present at the scene.  (Rochell Dep., Doc. 78-2 at 77:4–7.)  Officer Kubiak has advanced training for recognizing symptoms associated with drug and alcohol intoxication. (*See id.* at 82:6–15.)  Patterson exhibited symptoms consistent with intoxication: unsteadiness, confusion, and disorientation.  (*See id.* at 174:6–13.)  Officer Kubiak believed Patterson was high on drugs and informed Rochell that he believed Patterson should be arrested for public intoxication.  (*See id.* at 125:13–24.)  Rochell arrested Patterson and booked him on suspicion of public intoxication.  (*See* Doc. 78-5 at 1.)

During booking, Patterson responded to Rochell's commands.  (*See* Rochell Dep., Doc. 78-2 at 176:10–177:2.)  However, Patterson was also hallucinating and falling in and out of sleep at the Muskogee Police Department during the booking process.  (*See* Doc. 93-4 at 4).  Following the booking process, Rochell walked Patterson across the street to Muskogee County Jail. (*See* Rochell Dep., Doc. 78-2 at 93:9–94:2.)  During this walk, Patterson informed Rochell that he may have low blood sugar, but he did not inform Rochell that he had diabetes.  (*See* Rochell Dep., Doc. 78-2 at 165:18-163:21.)  When Patterson told Rochell that he may have low blood sugar, Rochell

responded by telling Patterson that if he had diabetes, he needed to inform staff at Muskogee County Jail that he was a diabetic. (*See* Rochell Dep., Doc. 78-2 at 93:9–94:2.)

During the intake process at Muskogee County Jail, Patterson informed the booking officer—Officer Steven Gilley ("Officer Gilley")—that he had diabetes. (*See id.* at 133:15-136:25.) Rochell was present and heard Patterson inform Officer Gilley that he had diabetes. (*Id.* at 134:22-135:9.) Officer Gilley marked on the intake Medical Questionnaire that Patterson was a diabetic. (Doc. 81-11 ¶ 7.) However, Officer Gilley did not verbally inform the proper medical personnel that Patterson was diabetic, and instead, assumed that medical staff members would review the Medical Questionnaire. (*See id.* ¶ 8.) Shift Supervisor Robert Reynolds ("Supervisor Reynolds") was also present when Patterson was being admitted into Muskogee County Jail. (*See id.* ¶ 9.) It is unclear whether Supervisor Reynolds was aware Patterson had diabetes. Regardless of his knowledge, during the intake process, Reynolds had a medical staff member—Rachael Petroski ("Petroski")—approve Patterson for admission for detox. (Reynolds Dep., Doc. 81-12 at 68:7–18.) Petroski is a certified medical assistant. (Petroski Dep., 92-7 at 63:3–5.) When Petroski examined Patterson for admission, he was verbal, speaking, and still able to walk. (*Id.* at 167:24-168:3.) Petroski did not review the Medical Questionnaire in which Officer Gilley recorded that Patterson had diabetes. (Arnold Dep. Doc. 81-19 at 75:23-76:7.) There was a policy that required jail staff to check the blood sugar of a known diabetic who was being admitted. (*Id.* at 64:16–65:12.) Patterson's blood sugar levels were not checked.

Patterson was officially booked and admitted into Muskogee County Jail at 8:35 a.m. on June 17, 2018. (Doc. 78-8 at 1.) After Patterson was admitted, Rochell left because Muskogee County Jail assumed custody of Patterson. (*See* Rochell Dep., Doc. 78-2 at 178:10–14.) When Patterson was admitted into Muskogee County Jail, he was placed in Cell 113 to detox. (Doc. 81-

11 ¶ 9.)  Around 4:00 p.m. on June 17, Officer Gilley moved Patterson from Cell 113 to Cell 114.  (*Id.* ¶ 10.)  At some point in the morning of June 17 when Patterson was in Cell 113 he vomited.  (*See* Reynolds Dep., Doc. 81-12 at 83:15–17.)  Supervisor Reynolds alleges that he did not know Patterson vomited.  (*See id.*)  However, Petroski in her deposition stated that Patterson had vomited and jail staff had cleaned it up. (Petroski Dep., Doc. 81-15 at 155:6–25.)  Petroski also explained that the commanding officers on duty should have noticed a pool of vomit because they conduct cell checks every hour. (*Id.* at 157:18–158:1.)  Officer Gilley is a commanding officer and moved Patterson to Cell 114, but he claims he did not notice the visible vomit.  (*See* Doc. 94, Ex.'s 19 and 22 (video evidence showing that Patterson vomited and bile is still visible when he is moved out of Cell 113.))  Officer Gilley alleges that Patterson continued to verbally respond to his questions throughout June 17.  (Doc. 81-11 ¶ 11.)  By contrast, Plaintiff claims Patterson's symptoms had worsened by the time Officer Gilley moved him to Cell 114.  According to Plaintiff, Patterson could no longer talk or walk on his own power at this point, and Officer Gilley admitted during an interview with Sheriff Rob Frazier[1] that Patterson was just mumbling when he was moved to Cell 114.  (Doc. 94, Ex. 20 at 4:40.00–4:50.00.)

Patterson remained in detox Cell 114 until the next day (June 18).  Both Officer Gilley and Petroski worked on June 18.  (Doc. 81-11 ¶ 12; Petroski Dep., Doc. 81-15 at 176:1–4.)  Additionally, Nurse Ellen Arnold ("Nurse Arnold") was also working on June 18.  (Doc. 81-11 ¶ 14.) Officer Gilley was the Shift Supervisor and began work at 7:00 a.m.  (*Id.* ¶ 12.)  Petroski

---

[1] Plaintiff's claim against the Sheriff of Muskogee is an official capacity claim.  Hence, the current sitting Sheriff of Muskogee County is substituted into the lawsuit as the defendant being sued in his official capacity.  Since this case was filed in February of 2020, there have been three Sheriffs of Muskogee County named as defendants in Plaintiff's case.  Plaintiff originally filed his official capacity claim against Sheriff Rob Frazier, the former Sheriff of Muskogee County. (Doc. 16 at 1.)  His successor, Sheriff Terry Freeman, replaced him as a Defendant—via minute order from the court—on March 19, 2020.  Sheriff Freeman was succeeded as Muskogee County Sheriff by Andy Simmons on January 4, 2021.  (Doc. 32 at 1.)  Sheriff Simmons then replaced Sheriff Freeman as Defendant in this case—again via minute order—on January 11, 2021.  The record indicates there has not been a subsequent substitution since Sheriff Simmons became Defendant in 2021.

checked on Patterson around 6:40 a.m. when she arrived for her shift, (Petroski Dep., Doc. 81-15 at 176:2–20), and again around 10:30 a.m., (*see id.* at 176:23–177:3). The second time Petroski checked on Patterson, she became concerned because he was still lying naked on the floor and was in the same position as he had been the day before.  (*See id.* at 177:1–16.)

Petroski called Nurse Arnold to Patterson's cell during this second visit.  (*See id.* at 177:1–3.)  Nurse Arnold did not know Patterson was diabetic. (Hall Dep., Doc. 81-21 at 122:1–4.)  Nurse Arnold allegedly conducted an assessment on Patterson. (Doc. 81-28.)  She left after the assessment and planned on returning to check on Patterson again.  (Petroski Dep., Doc. 81-15 at 134:18-135:4.)  Around 11:50 a.m. on June 18, a staff member of Muskogee County Jail, who was observing Patterson in his cell via a live stream video feed, became concerned because Patterson was not moving his legs. (Watson Dep., Doc. 81-26 at 139:22–141:16.)  Out of concern for Patterson, the staff member contacted Officer Gilley so he could check on Patterson.  (Doc. 81-11 ¶ 13.)  When Officer Gilley entered the cell, he also became concerned about Patterson's health and had a staff member contact Nurse Arnold.  (*See id.*)  When Nurse Arnold arrived this second time, she noticed Patterson's breathing was shallow and he was not resisting pressure on his extremities.  (Doc. 81-28 at 1.)  Nurse Arnold then called 911, and an ambulance took Patterson to the hospital.  (Arnold Dep., Doc. 81-19 at 135:7–17.)  Patterson died at the hospital, and the cause of death was ultimately determined to be diabetic ketoacidosis, with the methamphetamine in his system contributing to his death.  (Doc. 83-2 at 9.)

## III.    Standard

Summary judgment is appropriate if the moving parties demonstrate that there is no genuine dispute as to any material fact and the movants are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  A fact is "material" when it is essential to the claim, and the issues of fact

are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor. *Haynes v. Level 3 Commc'ns*, 456 F.3d 1215, 1219 (10th Cir. 2006). The court views all evidence and reasonable inferences in the light most favorable to the nonmoving party. *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

In considering a motion for summary judgment, the facts set forth in the motion "shall begin with a section stating the material facts to which the movant contends no genuine dispute exists." LCvR 56.1(b). "All material facts set forth in the statement of the movant may be deemed admitted for the purpose of summary judgment unless specifically controverted by the nonmovant . . . ." LCvR 56.1(e). To properly dispute a proposed statement of material fact, the opposing party must refer "with particularity, to any evidentiary material that the party presents in support of its position." LCvR 56.1(d). Failure to properly controvert a proposed fact that is properly supported will result in a determination that the fact is admitted. *Coleman v. Blue Cross Blue Shield of Kansas, Inc.*, 287 F. App'x 631, 635 (10th Cir. 2008) (finding that the "district court was correct to admit all facts asserted in Blue Cross's summary judgment motion that are not controverted by a readily identifiable portion of the record.") (internal quotation and citation omitted).

## IV. Analysis

### A. Police Officer Rochell

Defendant Rochell raises the affirmative defense of qualified immunity against Plaintiff's 42 U.S.C. § 1983 Fourth Amendment violation claim and Fourteenth Amendment violation claim. (Doc. 78 at 29.) When a defendant claims he is entitled to qualified immunity in a § 1983 case, the defendant is presumed to be immune from the action. *Est. of Smart by Smart v. City of Wichita*, 951 F.3d 1161, 1168 (10th Cir. 2020). To overcome this presumption, a plaintiff bears the heavy burden of showing: (1) the defendant's conduct violated a constitutional right, and (2) the

constitutional right was clearly established at the time of the violation such that "every reasonable official would have understood" their action constituted a violation of the right. *Perea v. Baca*, 817 F.3d 1198, 1202 (10th Cir. 2016) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)). Plaintiff bears the burden of satisfying both elements, and Defendant will prevail if Plaintiff fails to satisfy either prong. *Gross v. Pirtle*, 245 F.3d 1151, 1156 (10th Cir. 2001). The court may go directly to either prong, as both prongs must be established. *Pearson v. Callahan*, 555 U.S. 223, 241–42 (2009).

Here, the court addresses the first prong: whether Rochell's conduct violated Patterson's Fourth and/or Fourteenth Amendment rights. It ultimately concludes that Rochell's conduct did not violate Patterson's constitutional rights. Therefore, because this conclusion is dispositive, the court does not reach the issues of whether Patterson's constitutional rights were clearly established.

### 1. *Fourth Amendment Violation*

Plaintiff alleges Rochell did not have probable cause to make an arrest, and thus, violated Patterson's Fourth Amendment rights. (Doc. 93 at 19.) Rochell argues that he had probable cause to arrest Patterson for public intoxication. (Doc. 78 at 21.) For the following reasons, the court finds that Rochell did have probable cause to arrest Patterson for public intoxication such that he did not violate his Fourth Amendment right against wrongful arrest.

An officer has probable cause to arrest a person when the "facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense." *Mocek v. City of Albuquerque*, 813 F.3d 912, 925 (10th Cir. 2015). Notably, whether probable cause existed is not based upon an officer's subjective belief but is based upon an

objective inquiry into the circumstances.  *See Apodaca v. City of Albuquerque*, 443 F.3d 1286, 1289 (10th Cir. 2006).

Here, Rochell arrested Patterson for public intoxication, which is a City of Muskogee offense.  (*See* Doc. 78-3 at 1.)  The City of Muskogee prohibits "consum[ing] any intoxicating substance in any public place . . . [and from being] intoxicated in a public place."  (*Id.*)  Hence, to be found guilty of committing this offense—or for there to be probable cause that a person committed this offense—a suspect must be in a public place and either be caught consuming an intoxicating substance, be intoxicated, or appear intoxicated to a reasonable person.

Patterson was in a public street when the Muskogee Police Department received a call regarding his suspicious activity.  (Doc. 78-1 at 1.)  Hence, he was present in a public place. However, Plaintiff disagrees that based upon Rochell's knowledge, a reasonable person would believe Patterson was intoxicated.  Plaintiff's argument is unavailing.

Under Oklahoma law, the meaning of a "state of intoxication" is sufficiently well understood that it does not need a separate definition, but at the very least, would entail outward symptoms of "impaired mental judgment and physical responses."  *Findlay v. City of Tulsa*, 561 P.2d 980, 984 (Okla. Crim. App. 1977).

Patterson exhibited symptoms consistent with the common understanding of intoxication. When Rochell arrived at the scene of the arrest, Patterson was shirtless, conscious, and sitting on a curb.  (Rochell Dep., Doc. 78-2 at 186:4-7.)  He was also unsteady, confused, and disoriented. (*See* Rochell Dep., Doc. 78-2 at 174:6-13.)  Moreover, there were two officers already present at the scene when Rochell arrived, including Officer Kubiak, who has advanced training in recognition of drug and alcohol intoxication.  (Rochell Dep., Doc. 78-2 at 82:6–15.)  Officer Kubiak informed Rochell that he believed Patterson was high on drugs and should be arrested for

public intoxication.  (*See id.* at 125:13–24.)  Rochell relies on *Rife v. Oklahoma Department of Public Safety*, 854, F.3d 637 (10th Cir. 2017), in which the Tenth Circuit Court of Appeals determined that a state trooper had probable cause to arrest an individual because he appeared intoxicated even though his symptoms were caused by a head injury from a motorcycle accident. *See id.* at 643–44, 645.  The court of appeals ruled in favor of the trooper because plaintiff's head injury symptoms reasonably suggested intoxication.  *Id.* at 645.

Plaintiff argues that there was a lack of trustworthy evidence that Patterson was intoxicated. (Doc. 93 at 19.)   However, Plaintiff fails to point to any facts in the record that would controvert the evidence indicating that Patterson appeared intoxicated.  Plaintiff also disagrees with Rochell's reliance on *Rife*.  Plaintiff focuses on the fact that in *Rife*, the trooper conducted a horizontal gaze nystagmus test ("HGN test") on the plaintiff, which demonstrated six clues that the plaintiff was intoxicated.  *See id.* at 644.  Plaintiff claims this fact makes *Rife* inapposite because Rochell did not conduct a HGN test or a field sobriety test before arresting Patterson for public intoxication. But as discussed above, because Patterson had symptoms consistent with intoxication that were visibly apparent, there was no need for Rochell to conduct a field sobriety test.

Therefore, for the reasons stated herein, Rochell had probable cause to arrest Patterson for public intoxication and is entitled to summary judgment on Plaintiff's Fourth Amendment claim.

   2. *Fourteenth Amendment Violation*

Plaintiff also raises a § 1983 claim against Rochell for violating Patterson's Fourteenth Amendment rights by being deliberately indifferent to Patterson's medical needs as a pretrial detainee.

A plaintiff makes out a cognizable Fourteenth Amendment Claim for being deliberately indifferent to a detainee's medical needs by showing: (1) the alleged deprivation was sufficiently

serious, and (2) the law enforcement officer had a "'sufficiently culpable state of mind.'"  *See Self v. Crum*, 439 F.3d 1227, 1230–31 (10th Cir. 2006) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).  This framework's first prong is an objective test, and the second prong is a subjective test.

Rochell opposes Plaintiff's claim via the subjective prong, acknowledging that Patterson's death satisfies the objective prong.   (Doc. 78 at 22.)

A plaintiff satisfies the subjective test by demonstrating the defendant was aware of the excessive risk to a detainee's medical needs and consciously disregarded the risk.  *See Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (citing *Farmer*, 511 U.S. at 837)).  To demonstrate a defendant knew of the excessive risk, a plaintiff may rely on circumstantial evidence.  *See Mata*, 427 F.3d at 752.  Circumstantial evidence has been defined as the "obviousness of the condition." *Tafoya v. Salazar*, 516 F.3d 912, 916 (10th Cir. 2008).  According to the court in *Tafoya*, if a medical risk is so obvious that a reasonable person would realize there was a risk, a court may infer that the defendant was aware of the risk.  *See id* at 916–17.  Nevertheless, a "defendant may present evidence to show that he was in fact unaware of the risk, in spite of the obviousness." *Id*. at 917.  As to the second prong (i.e., demonstrating a defendant consciously disregarded the risk), there is no need to demonstrate a defendant had an "express intent to harm" or that the defendant believed he would harm the plaintiff by acting or failing to act.  *Mata*, 427 F.3d at 752.  One method of demonstrating a defendant consciously disregarded the risk is showing that despite knowing about the medical risk, the defendant "fail[ed] to take reasonable steps to alleviate that risk."  *See Tafoya*, 516 F.3d at 916.

The timeline in this case is important because Plaintiff claims Rochell failed to realize Patterson was enduring an ongoing medical emergency of diabetic ketoacidosis at the scene of the

arrest through the point when Muskogee County Jail took Patterson into custody.  There are three episodes in this timeline: arrest, booking, and intake.  The court takes each episode in turn.

    a.  Scene of Arrest

Rochell does not have medical training beyond basic first aid and CPR.  (*See* Rochell Dep., Doc. 78-2, 173:11–17.)  However, he was trained to notice signs of intoxication, which include unsteadiness, profuse sweating, and disorientation.  (*See id.* at 174:6–13.)  Patterson exhibited some of these symptoms: he was unsteady, confused, and disoriented.  (*See id.* at 86:7–20.)  Based on his training and Patterson's symptoms, Rochell arrested Patterson on suspicion that he was intoxicated.  (*See* Doc. 78-5 at 1.)  Moreover, one of the officers at the scene, Officer Kubiak, has advanced training in drug and alcohol intoxication and advised Rochell that Patterson was intoxicated and should be arrested for public intoxication.  (*See* Rochell Dep., Doc. 78-2, at 81:14–82:15; 125:16–24.)

Second, Rochell is trained to seek medical attention for arrestees with symptoms that indicate the person was involved in an accident that caused physical trauma.  Rochell was thus looking for symptoms of head trauma, wounds, and consciousness.  (*See* Farmer Dep., Doc. 78-7 at 14:22–15:17.)  Rochell is also required to seek medical help for an arrestee if the arrestee requests it.  (*See* Rochell Dep., Doc. 78-2 at 177:10–23.)  It is undisputed that Patterson exhibited no signs of physical trauma, (*see id.* at 94:11–24), and that Patterson did not request medical attention at the scene of the arrest, (*see id.* at 177:10–23 (Rochell explaining that had Patterson requested medical attention, he would have provided it)).  It is also undisputed that Patterson was not wearing a bracelet that identified him as a diabetic, (*see id.* at 174:14–19), nor was he wearing an insulin pump or carrying medications on his person that would signal to Rochell that he was diabetic.  (*See id.* at 174:20–25.)

By contrast, Plaintiff argues that Patterson's medical distress at the scene was obvious. Plaintiff bases his argument upon multiple facts. Plaintiff claims no one, not even Officer Kubiak, conducted a field sobriety test on Patterson because Rochell admitted that he did not see Officer Kubiak perform a field sobriety test. (*See id.* at 79:15–22.) Plaintiff also argues that because Patterson did not smell of alcohol, Rochell should have known there was a medical emergency. (*See* Rochell Dep., Doc. 93-2 at 161:5–7.) Plaintiff also alleges that Patterson's hallucinations, confusion, and failure to answer Rochell's questions indicated he was suffering from a medical emergency. (See *id.* 161:13–162:8.)

The court disagrees. The record indicates Rochell would not have known a substantial risk of serious harm existed at the scene of the arrest. Patterson was confused, slurred his speech, and hallucinated—symptoms that parallel those of intoxication. Rochell also relied upon Officer Kubiak, the expert present at the scene, to conclude that Patterson was intoxicated. Lastly, and most importantly, Patterson did not tell Rochell he was diabetic, nor did he have any devices, bracelets, or other gear that would have put Rochell on notice that Patterson was diabetic when the arrest was made. Plaintiff's statement that it was obvious Patterson was suffering a medical emergency rests on that very assumption: that Rochell knew or should have known Patterson was a diabetic. Without that key piece of information, Patterson's medical emergency and risks were not obvious.

b. Booking

Rochell booked Patterson on suspicion of public intoxication. (*See* Doc. 78-5 at 1.) At the station house, Patterson appears to have remained in a semi-lucid state. It is undisputed that he responded to Rochell's commands, (*see* Rochell Dep., Doc. 78-2 at 176:10–177:2) but hallucinated and was falling in and out of sleep, (*see* Doc. 93-4 at 4). Rochell argues, however, that Patterson's

condition did not deteriorate more from time of arrest through the booking procedures.  (Doc. 78 at 24.)

Plaintiff again relies on *Rife* for the proposition that an obvious health emergency could indicate awareness of the risk.  854 F.3d at 647.  In *Rife*, a state trooper mistakenly concluded that the plaintiff was intoxicated with pain medication and arrested him for public intoxication.  *Id.* at 641.  Notably, the state trooper arrived at the scene of an accident.  *Id.*  The state trooper explicitly stated he knew of the accident, could see plaintiff had visible injuries (e.g., the plaintiff had dried blood on his nose), and heard the plaintiff complain of intense chest and heart pain.  *Id.* at 650.  The court took special notice of the trooper's knowledge that the plaintiff had possibly been in a motorcycle accident because awareness of an alternative cause inhibits the trooper from alleging that he is unaware of an alternative cause to a plaintiff's symptoms.  *Id.* at 649.  Hence, according to the court, even if the plaintiff's symptoms could be consistent with intoxication, they were also consistent with a motorcycle accident.  *Id.*  As such, the court concluded that the defendant state trooper was aware of the substantial risks to the plaintiff's health.  *Id.*

But here, Plaintiff's reliance on *Rife* is misplaced.  Although Plaintiff is correct that *Rife* stands for the proposition that circumstantial evidence can be used to demonstrate awareness of an obvious health risk, *id.* at 647, in *Rife* the plaintiff's injuries had a clear alternative cause, the motorcycle accident.  Indeed, the state trooper saw grass stains on the plaintiff's pants and jacket and explicitly stated that he knew the plaintiff had been in an accident.  *Id.* at 648, 649.

In the present case, however, Rochell was still missing a key piece of information during the booking procedure: that Patterson was diabetic.  Moreover, during the booking procedure, Patterson responded to questions and commands.  (Rochell Dep., Doc. 78-2 at 176:10–177:9.) There was no apparent alternative cause of Patterson's symptoms at the booking stage, and while

in hindsight it may seem that Patterson could have been suffering a medical emergency, whether Rochell was aware of the medical risk is based on "information known at the time, not by facts developed later." *Hutto v. Davis*, 972 F. Supp. 1372, 1376 (W.D. Okla. 1997). Thus, the court concludes that Rochell did not have actual knowledge of Patterson' medical risks during booking and the facts do not demonstrate Patterson's medical risks were so obvious that a reasonable person would realize there was a risk.

     c.   Intake

There are two scenes in this third episode: (1) the walk from the station house to the jail, and (2) the intake process at the jail.

In the first episode, during the walk from the station house to the jail, Patterson informed Rochell that he may have low blood sugar—not that he had diabetes. (*See* Rochell Dep., Doc. 78-2 at 165:18-163:21.) However, Rochell responded to Patterson's concern about his low blood sugar by encouraging him to inform staff at the jail if he had diabetes. (*See* Rochell Dep., Doc. 78-2 at 93:9–94:2.) During the second episode, at the intake process, Patterson did in fact inform an officer that he had diabetes. (*See id.* at 133:15-136:25.)

Rochell argues that he could not have known of Patterson's serious medical needs, even when Patterson informed him that he may have low blood sugar. (Doc. 78 at 24.) Rochell relies on *Quintana v. Santa Fe Cnty. Bd. of Commissioners*, 973 F.3d 1022, (10th Cir. 2020), where the Tenth Circuit upheld the proposition that common drug withdrawal symptoms do not present an obvious medical risk. *Id.* at 1029. The court explained, however, that withdrawal symptoms coupled with other serious medical symptoms—like vomiting blood—would present a serious and obvious medical risk. *Id.* at 1029–30.

Here, Patterson was obviously not vomiting blood. He also exhibited signs of intoxication and remained in a semi-lucid state in which he was able to follow commands and talk. (*See* Rochell Dep., Doc. 78-2 at 176:10–177:5.) But Rochell's response to Patterson about informing jail staff that he may have diabetes indicates awareness of an alternative cause to Patterson's symptoms. Rochell may not have had actual knowledge of Patterson's diabetes because Patterson only stated he may have low blood sugar, but the evidence indicates he was at least aware Patterson may be a diabetic and suffering from low blood sugar.

Nevertheless, even if Rochell became aware of a serious risk of harm to Patterson on the walk to Muskogee County Jail, Rochell did not consciously disregard Patterson's serious medical risks. In the past, Muskogee County Jail had required Rochell to medically clear prospective detainees at a hospital before they were admitted, if medical personnel of Muskogee County Jail determined that a detainee may be experiencing a medical emergency. (*See* Rochell Dep., Doc. 78-2 at 172:8–12.) With that knowledge, Rochell knew that the nearest medical professionals to the station house were across the street at the Muskogee County Jail, and if they believed Patterson was suffering from a serious medical risk, they would not admit him. (*See id.* at 163:13–21.) During the intake process at Muskogee County Jail, a medical staff member, who Rochell believed to be a nurse, observed Patterson in the intake area and told the intake supervising officer that she approved Patterson for detox. (*See id.* at 135:4–9; Boulet Dep., Ex. 11 at 140:16–20.) As such, Rochell believed Patterson was not experiencing a serious medical risk and left Muskogee County Jail only after medical staff approved Patterson for admission. (*See* Rochell Dep., Doc. 78-2 at 177:25–178:9.)

Therefore, the undisputed facts show that even if Rochell became aware of Patterson's serious medical risks during this third stage, he did not disregard those risks because he took

Patterson to the nearest medical personnel, encouraged Patterson to inform staff at Muskogee County Jail that he may be a diabetic, observed Patterson in fact inform Officer Gilley that he was diabetic, and he was ready to take Patterson to the hospital if the medical staff believed Patterson was suffering a serious medical emergency. Thus, when Rochell observed medical staff clear Patterson for admission, Rochell continued to believe that Patterson was intoxicated and that there was no medical emergency, and he did not consciously disregard the risks because medical staff cleared Patterson for admission.

Based on the foregoing, Rochell is entitled to summary judgment on Plaintiff's Fourteenth Amendment claim against him.

**B. City of Muskogee**

*1.  § 1983 Claims*

Plaintiff's municipal liability claims against Muskogee fail because Rochell did not commit a constitutional violation when arresting and booking Patterson.

As a matter of law, "a municipality cannot be held liable under section 1983 for the acts of an employee if a jury finds that the municipal employee committed no constitutional violation." *Myers v. Oklahoma Cnty. Bd. of Cnty. Comm'rs*, 151 F.3d 1313, 1316 (10th Cir. 1998). Hence, if there is no constitutional violation by the municipal employee being supervised in a case, a claim of inadequate training, supervision, etc. under § 1983 cannot be sustained. *See Webber v. Mefford*, 43 F.3d 1340, 1344–45 (10th Cir. 1994).

In this case, the supervisee is Rochell. Thus, to determine if Muskogee can be held liable for failing to train and supervise him, there must be a determination that Rochell violated Patterson's constitutional rights. As already determined by the court, Rochell did *not* violate Patterson's constitutional rights when he arrested, booked, and delivered Patterson to Muskogee

17

County Jail. *See supra* Sections IV.A.2.a–c. Therefore, summary judgment is granted in favor of Muskogee with regard to Plaintiff's § 1983 claims against it.

### 2. *State Law Negligence Claim*

Plaintiff's state law negligence claim fails as well. Plaintiff's negligence claim against Muskogee is predicated on Rochell's alleged negligence. To succeed, Plaintiff must "establish the concurrent existence of: a duty on the part of the defendant to protect the plaintiff from injury; a failure of the defendant to perform that duty; and an injury to the plaintiff resulting from the failure of the defendant." *Kraszewski v. Baptist Med. Ctr. of Oklahoma, Inc.*, 916 P.2d 241, 245 (1996).

At issue here is the second element, as Plaintiff claims Rochell breached or failed to perform his duty "to assure that [Patterson] received prompt and adequate medical treatment for his obvious needs." (Doc. 2, ¶ 99.) The uncontroverted evidence indicates otherwise. Muskogee incorporates the evidence relied upon by Rochell in his motion for summary judgment briefing to demonstrate that Rochell did not breach his duty to reasonably assure Patterson was provided medical care.

At the scene of the arrest, Patterson exhibited no signs of physical trauma, (*see* Rochell Dep., Doc. 78-2 at 94:11–24), and did not request medical attention at that time, (*see id.* at 177:10–23.) At this point, Rochell did not know, and could not have known, Patterson was diabetic because he was not wearing a bracelet that identified him as a diabetic, (*see id.* at 174:14–19), nor was he wearing an insulin pump or carrying medications on his person that would signal to Rochell that Patterson was diabetic, (*see id.* at 174:19–25). And at the station house during Patterson's booking, he continued to exhibit signs that he was intoxicated on drugs. (*See* Doc. 93-4 at 4.) It was not until the walk from the police station to the county jail where Rochell learned that Patterson's symptoms may have an alternative cause: low blood sugar. (Ex. 2, Dep. Rochell,

163:3-163:21.)  At this point, Rochell told Patterson that if he was diabetic, then he needed to inform the staff at Muskogee County Jail that he had diabetes and possibly had low blood sugar. (*See* Rochell Dep., Doc. 78-2 at 93:9–94:2.)  Rochell knew that Muskogee County Jail had medical staff who would evaluate detainees for medical/health issues and either approve or decline their admittance to the Jail.  (*See* Rochell Dep., Doc. 78-2 at 163:13–21, 172:8–12.)  Rochell also knew Muskogee County Jail had this policy because it had required him to medically clear a detainee in the past before it would admit that detainee.  (*See id.* at 172:8–12.)  Knowing Muskogee County Jail would decline admittance if there was a medical emergency, Rochell told Patterson that, if he had diabetes, he needed to inform the intake personnel (1) that he was in fact diabetic, and (2) that he was possibly suffering from low blood sugar.  Importantly on this issue, Rochell heard Patterson tell the intake officer that he had diabetes, and he saw a medical staff member who was present during the intake process approve Patterson's admission to detox.  (*See id.* at 135:4–9; Boulet Dep., Ex. 11 at 140:16–20.)  This fact is borne out by the intake officer's admission that Patterson told the officer that he was diabetic and that this fact was included on the medical intake questionnaire.  (Doc. 81-11 ¶ 7.)

Therefore, Rochell fulfilled his duty to Patterson by delivering him to a place where medical personnel on site could evaluate/monitor him.  Rochell also knew and was ready to take Patterson to a hospital if the intake nurse or other medical staff determined it was necessary to medically clear him before admission to detox.  That did not occur.  But it was not the fault of Rochell, and he did not breach his duty to Patterson because the medical personnel at Muskogee County Jail decided Patterson did not need to be medically cleared.  Therefore, Rochell was not negligent, and hence, the court grants the City of Muskogee summary judgment on Plaintiff's state law negligence claim.

### C. Muskogee County Sheriff

Plaintiff's last claim is against Defendant Sheriff Simmons in his official capacity. (Doc. 81 at 20.) The claim arises under § 1983, and Plaintiff alleges a Fourteenth Amendment violation for denial of adequate medical care. (*Id.*) An action against a government officer in his official capacity is just a different way to plead "an action against the county or municipality they represent." *Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010). Hence, the court analyzes Plaintiff's claim under the same analytical framework that governs claims against municipalities and counties for constitutional violations. *Id.*

A plaintiff establishes municipal liability through this general analytical framework: "[a] policy was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury" and caused the constitutional violation. *See Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013). Broken down, there are three elements a plaintiff must establish: "(1) official policy or custom, (2) causation, and (3) state of mind." *Id.* These three elements are broken down in turn.

An official policy or custom can take shape in a variety of formats: a formally adopted and promulgated regulation or policy, an informal custom so widespread that it becomes a policy with the force of law, the final decision from a policymaker with decision making authority, or, as was raised in this case, a failure to adequately train or supervise employees that amounts to deliberate indifference. *See Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010); *Schneider*, 717 F.3d at 770.

Causation is established if the policy or practice is the "'moving force' behind the injury alleged." *See Brown v. Flowers*, No. 23-7006, 2023 WL 6861761, at *9 (10th Cir. Oct. 18, 2023) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 404 (1997)).

20

Applicable to the present case, if the constitutionality of a municipal policy is not at issue, but instead liability is based upon inadequate training or supervision, then the causation element is analyzed more rigorously "to ensure that the municipality is not held liable solely for the actions of its employees." *Brown*, 520 U.S. at 405. This is so because municipal liability cannot be based upon vicarious liability. *See Schneider*, 717 F.3d at 770. Hence, Plaintiff must establish that Sheriff Simmons' failure to train and supervise his employees was the moving force behind Patterson's death.

The final element of "state of mind" is the deliberate indifference standard. To satisfy the deliberate indifference standard, a plaintiff must demonstrate that the municipality, or as is the case here, Sheriff Simmons, was on notice—actual or constructive—that the policy, action, or failure to act "is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998). In other words, Plaintiff must demonstrate that Sheriff Simmons had knowledge that failure to train and supervise employees could result in Patterson's death.

However, before reaching the question of whether Sheriff Simmon's (1) failure to train his employee(s) was (2) the driving force behind Patterson's death, and (3) he was aware that deficiencies in employee training could lead to Patterson's death, Plaintiff must establish that an agent or employee of Sheriff Simmons violated Patterson's Fourteenth Amendment right to adequate medical care. To do so, Plaintiff must demonstrate that at least one of the employees named in the briefings were *deliberately indifferent* to Patterson's medical needs.[2]

---

[2] Plaintiff also suggested that Defendant is liable because the sum of his actions "failed to ensure that any single officer is positioned to prevent the constitutional violation." *See Crowson v. Washington Cnty. Utah*, 983 F.3d 1166, 1191 (10th Cir. 2020). The Tenth Circuit in *Crowson* relied on the ruling in *Garcia v. Salt Lake County* that a plaintiff may establish municipal liability without a claim against an individual if he can show "gross deficiencies in staffing, facilities, equipment, or procedures . . . effectively denied access to adequate medical care." *Id.* at 1187 (quoting *Garcia v. Salt Lake Cnty.*, 768 F.2d 303, 308 (10th Cir. 1985)). Under this theory, municipal liability does not require that an individual defendant violate a plaintiff's constitutional rights. *Quintana*, 973 F.3d at 1033; *see*

The deliberate indifference standard has both an objective and subjective component.  *See Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1315 (10th Cir. 2002).  Sheriff Simmons does not dispute that Patterson's death satisfies the objective prong of the framework.  (Doc. 92 at 23.) However, he disputes Plaintiff's claim under the subjective prong of the deliberate indifference standard; namely, that the four named employees (Officer Gilley, Supervisor Reynolds, Rachael Petroski, and Nurse Arnold) were not aware of Patterson's medical risks, and hence, could not have disregarded the risks to Patterson's health or safety.  *See Burke v. Glanz*, No. 11-CV-720-JED-PJC, 2016 WL 3951364, at *17 (N.D. Okla. July 20, 2016).  Plaintiff disagrees.  Plaintiff argues that each employee's conduct satisfies the subjective prong of the deliberate indifference test.

### 1.  Individual Violations

#### a.  Officer Steven Gilley

Plaintiff asserts Officer Gilley was deliberately indifferent to his medical needs at two separate stages: booking/intake and detox.

##### i.  Booking/Intake

##### A.  Awareness

Sheriff Simmons concedes that Officer Gilley was aware of Patterson's diabetes.  The undisputed facts indicate Officer Gilley marked on the intake Medical Questionnaire that Patterson was diabetic.  (Doc. 81-11 ¶ 7.)  Sheriff Simmons maintains, however, that Officer Gilley was not aware of Patterson's serious medical condition of diabetic ketoacidosis.

---

*also Crowson*, 983 F.3d 1166.  Under this systematic failure theory, liability is based upon a sum of actions that results in a failure to prevent the constitutional violation.

The court concludes that Sheriff Simmons' argument tries to parse Gilley's knowledge too far. Officer Gilley is not a medical professional, and the law does not require that he diagnose Patterson's condition to the level urged by the sheriff. As explained, *supra*, in the court's evaluation of claims against Officer Rochell, the key fact that precludes liability against Rochell is his lack of knowledge about Patterson's possible diabetes as an alternative cause for Patterson's symptoms of confusion, disorientation, and unsteadiness until the two were en route to the jail. By contrast, the evidence indicates that Officer Gilley *was* informed of Patterson's diabetes during intake, along with Patterson's presentation with the same or similar physical symptoms observed by Rochell. The court concludes that this was sufficient to put Officer Gilley on notice that Patterson presented with indications of a serious medical condition beyond mere intoxication such that Gilley was obliged to take action to follow up on that condition.

B. Conscious Disregard

Plaintiff cites *Sealock v. Colorado*, 218 F.3d 1205 (10th Cir. 2000) for the proposition that prison officials may be deliberately indifferent to an inmate whey they deny either treatment or access to medical care. *Id.* at 1211. However, Defendant notes that the court's discussion in *Sealock* about denial or prevention of access to medical care applies to the actions or inaction of medical professionals who serve as *gatekeepers* in those instances. *See id.* In *Sealock*, one of the defendants at issue was a physician's assistant, who had the responsibility of determining if an inmate's medical condition required emergency care or more advanced medical treatment. *Id.* Sheriff Simmons argues that because *Sealock* is about medical professionals playing the role as gatekeeper, it is inapplicable to Officer Gilley, who knew of Patterson's diabetes but was not the trained medical professional who determines whether detainees should receive emergency or more advanced medical treatment.

The court in *Sealock*, however, refers to two instances of deliberate indifference: (1) when a medical professional fails to treat a serious medical condition properly, and (2) when *a prison official* fails as a gatekeeper and "prevent[s] an inmate from receiving treatment or den[ies] him access to medical personnel capable of evaluating the need for treatment." *Id.* The court then discusses how medical professionals will usually not be liable for the second type of deliberate indifference. *Id.* The court's use of the phrase "prison official" when describing the second type of deliberate indifference (i.e., failing as a gatekeeper), and its discussion about why medical professionals will typically not be liable under the second form of liability indicates that the failure to act as a gatekeeper encompasses all prison officials—not just medical professionals. Thus, the court rejects Sheriff Simmons' argument that *Sealock* is inapplicable.

Moreover, the court holds that whether Officer Gilley was deliberately indifferent to Patterson's medical needs during the intake process is a jury question. Officer Gilley is a prison official whose role during the intake process was to record and communicate to other jail and medical staff if an incoming inmate has serious medical conditions or needs. (Doc. 81-11 ¶ 4.) Under *Sealock*, Officer Gilley is a gatekeeper, and the undisputed facts indicate Officer Gilley marked on the intake Medical Questionnaire that Patterson was diabetic. (*Id.* ¶ 7.) Although Officer Gilley may have operated under the assumption that the proper medical personnel would review the intake form and determine if Patterson needed emergency medical care, (*see id.* ¶ 8), he nevertheless failed to verbally communicate or actively attempt to inform medical staff that Patterson had diabetes, which is a violation of Muskogee County Jail policy. (*Id.*)

ii.  Post Booking/Detox

Additionally, Plaintiff argues that Officer Gilley was deliberately indifferent to Patterson's medical needs after the intake process when he moved Patterson to a different detox cell. Officer

24

Gilley moved Patterson to a different detox cell on June 17—around seven hours after Patterson's admission into Muskogee County Jail. (Doc. 92 at 24.) When Officer Gilley moved Patterson, Patterson was naked, nonverbal, and was having a hard time walking on his own power. (*Id.*) He had also been vomiting. (Petroski Dep., Doc. 81-15 at 155:6–25.) Officer Gilley claims he did not notice the vomit when he moved Patterson, but video evidence indicates that there is a large puddle of vomit on the floor. (*See* Doc. 94, Ex.'s 19 and 22.) Hence, the court concludes that there is factual dispute regarding Gilley's knowledge that Patterson vomited. Additionally, the evidence indicates that Patterson's symptoms had gotten worse from when he had been admitted. When he was admitted into Muskogee County Jail, he was communicating/talking, was walking, and had not vomited. (Petroski Dep., 92-7 at 167:24–168:3.)

Plaintiff argues that because Officer Gilley knew Patterson had diabetes and witnessed Patterson's symptoms getting worse, Officer Gilley was aware that Patterson was enduring a medical emergency and needed medical attention. The court agrees.

It is undisputed that Officer Gilley was aware Patterson had diabetes. (Doc. 81-11 ¶ 7.) Thus, similar to the court's conclusion in *Rife*, Officer Gilley cannot argue that he was unaware of an alternative cause to Patterson's symptoms. Additionally, Officer Gilley witnessed Patterson's symptoms getting worse. As discussed by the Tenth Circuit in *Paugh v. Uintah Cnty.*, 47 F.4th 1139, 1159 (10th Cir. 2022), when a detainee's symptoms are worsening, "a reasonable jury could find that [a] need for medical assistance was obvious." *Id.* at 1159. Here, evidence indicates that when Officer Gilley moved Patterson to Cell 114, he would have witnessed a decline in Patterson's condition. Armed with the knowledge that Patterson had diabetes, and being a witness to his symptoms getting worse, a reasonable jury could conclude that it was obvious that Patterson needed medical attention and that Officer Gilley was aware of Patterson's medical risks.

Additionally, when he transferred Patterson to Cell 114, it is undisputed that Officer Gilley did not seek medical assistance for Patterson.

Therefore, the court concludes that a jury could find that Officer Gilley was deliberately indifferent to Patterson's medical risks at the detox stage because he was (1) aware of Patterson's medical risks, and (2) failed to render or seek medical assistance for Patterson.

### b.  Individual Violations Conclusion

Plaintiff has raised facts sufficient to defeat Defendant's motion for summary judgment on the issue of whether an individual member of the jail or medical staff acted with deliberate indifference.  Because there needs to be only one individual violation, the court need not reach a decision about Supervisor Reynolds, Rachael Petroski, and Nurse Arnold's alleged individual violations.

### 2.  *Official Violation*

The second component of imposing municipal liability is whether an official policy or custom was the driving force behind Patterson's death, and that Sheriff Simmons was aware of the policy or custom that led to Patterson's death.  The court takes each element in turn.

### a.  Official Policy or Custom

An official policy or custom need not be a formally promulgated rule.  Rather, the Tenth Circuit has determined that a failure to adequately train or supervise employees that amounts to deliberate indifference may be deemed an official policy or custom for purposes of a § 1983 claim. *See Bryson*, 627 F.3d at 788.

Defendant Simmons argues that there were policies in place that required medical and jail staff to assess whether a pretrial detainee was fit for admittance.  (Doc. 81 at 27.)  Defendant further argues that there were policies in place that would protect diabetic detainees: for example,

when a diabetic is booked, that diabetic detainee needs to have his blood sugar levels determined. (Doc. 81 at 27.)  However, Defendant also admits that several of these policies were violated from the time Patterson was admitted into Muskogee County Jail through the time he was in "detox" at the jail.  (*See* Doc. 81 at 27–28.)  Defendant maintains, however, that despite these policy violations, staff *received* training on these policies but simply cannot remember that they received training.  (Doc. 100 at 10.)

By contrast, Plaintiff argues that the evidence indicates there is a factual dispute about whether Defendant's jail and medical staff received proper training.  It is undisputed that Muskogee County Jail had policies in place that would apply to Patterson's medical condition. (*See e.g.*, Reynolds Dep., Doc. 92-5 at 236:10–15; *see* Watson Dep., Doc. 92-15 at 173:19–174:4; Arnold Dep. 92–12 at 57:9–19.)  More specifically, Petroski admitted that she did not take Patterson's vital signs at the intake stage, which was a violation of a Muskogee County Jail policy. However, Petroski alleges that she did not receive training on that policy.  (Petroski Dep., Doc. 92-7 at 102:12–16.)  Additionally, there was a policy in place that required medical professionals to evaluate incoming detainees and determine if they are patients with special health care needs in order to refer them to appropriate treatment.  (*See id.* at 141:20–142:8.)  Petroski, who was the medical staff member present at the time of Patterson's intake, not only failed to identify that Patterson might have been suffering from a medical condition, but she did not even know she was required to identify patients who have special medical needs.   (*See id.* at 142:4–143:22.)  In summary, Plaintiff has provided evidence to establish a dispute of material fact as to whether Defendant adequately trained and supervised his staff in order to protect detainees like Patterson from serious medical risks.

      b.  Causation

Causation is established if the policy or practice is the "'moving force' behind the injury alleged." *See Brown v. Flowers*, No. 23-7006, 2023 WL 6861761, at *9 (10th Cir. Oct. 18, 2023) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 404 (1997)).

Defendant did not raise an argument as to whether it is plausible that a failure to train or adequately supervise his employees was the moving force behind Patterson's injury.

However, Plaintiff argues that the failure to train jail and medical staff about detecting emergent medical risks was the driving force behind Patterson's death. Plaintiff relies upon Reynold's testimony, where he explained that had they been trained on signs and symptoms of emergency medical issues like diabetic ketoacidosis, Patterson would have received proper medical treatment at a hospital because he would not have been medically cleared to enter the jail. (Reynolds Dep., Doc. 92-5 at 166:22–167:21.) Moreover, basic medical policies like verbally informing medical staff about a detainee's chronic illness was a policy that was not followed by Officer Gilley. (Doc. 81-11 ¶ 8.) Plaintiff argues that had Officer Gilley been trained on the basic medical policies, he would have informed medical staff that Patterson was a diabetic, and his symptoms would have been supervised by competent medical staff. (Doc. 92 at 29.)

The court concludes that Plaintiff has cited evidence to raise a dispute as to material fact that the failure to train and supervise jail and medical staff was the driving force behind Patterson's death.

### c.  State of Mind

To satisfy the "state of mind" element, Plaintiff needs to establish deliberate indifference; namely, Plaintiff must demonstrate that Defendant was on notice—actual or constructive—that the failure to train and supervise employees could result in Patterson's death, and that Defendant consciously chose to ignore the risk of harm. *See Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th

Cir. 1998).  At the summary judgment stage, to defeat Defendant's summary judgment motion, Plaintiff needs to cite evidence to establish a dispute of material fact as to whether Defendant was on notice of the risks and consciously ignored those risks.

Defendant argues that he could not be indifferent to Patterson's diabetic medical risks because he provided training about serious medical issues and their accompanying complications to jail and medical staff.  (Doc. 81 at 30.)  Defendant admits that there were numerous violations, but he maintains that such violations do not indicate staff were not trained or properly supervised.  (*Id.*)

Plaintiff argues that Defendant was aware that his medical delivery system was not constitutionally sufficient to protect detainees against serious medical risks.   Plaintiff argues that Defendant was aware of the medical systems' inadequacy because in 2017, Muskogee County Jail's private medical provider Turn Key stopped providing medical services because Defendant failed to provide basic medical support.  (Junod Dep., Doc. 92-30 at 59:9–24.)  Plaintiff then argues that instead of addressing the basic medical support deficiencies raised by Turn Key, Defendant maintained the status quo and did not properly train staff on Muskogee County Jail's basic medical policies.  Plaintiff relies on the evidence discussed in the previous section, where medical staff members like Petroski admitted they did not receive training on the medical policies.  (*See e.g.*, Petroski Dep., Doc. 92-7 at 141:20–142:8.)

Plaintiff next argues that because Defendant was aware of the deficiencies in the basic medical services but failed to rectify those deficiencies with, for instance, more training, Defendant consciously disregarded the risks.  (Doc. 92 at 29.)

The court finds that Plaintiff cited evidence to establish a dispute as to a material fact regarding Defendant's state of mind.  Although Defendant maintains he did not consciously

disregard the foreseeable risks to inmates like Patterson, Plaintiff cites evidence indicating that there is a dispute as to whether Defendant was aware of the deficiencies in the medical system at Muskogee County Jail and whether he consciously disregarded those risks by not training his jail and medical staff members on those policies.

Therefore, because Plaintiff has established a dispute of material fact regarding whether an individual employee of Muskogee County Jail committed a constitutional violation that was perpetuated by an official policy, the court denies Defendant Simmons' motion for summary judgment.

3.  Systematic Failure Causing a Constitutional Violation

The court does not reach the issue of whether Plaintiff defeated Defendant's motion for summary judgment on the alternate theory that absent an individual violation, a systematic failure of the system caused the alleged constitutional violation.  Because the court does not reach a decision on that alternate theory, it remains a viable argument moving forward.

## V.    Conclusion

IT IS THEREFORE ORDERED BY THE COURT THAT Defendant Rochell's motion for summary judgment is GRANTED.

IT IS FURTHER ORDERED BY THE COURT THAT Defendant City of Muskogee's motion for summary judgment is GRANTED.

IT IS FURTHER ORDERED BY THE COURT THAT Defendant Sheriff Simmons' motion for summary judgment is DENIED.


IT IS SO ORDERED.  Dated this 6th day of March 2024.

 s/ Judge Broomes
JOHN W. BROOMES
UNITED STATES DISTRICT JUDGE